Andrei Iancu (SBN 184973)
iancua@sullcrom.com
Robert A. Sacks (SBN 150146)
sacksr@sullcrom.com
Emily Olsen (SBN 353281)
olsenem@sullcrom.com
**SULLIVAN & CROMWELL LLP**
1888 Century Park East
Los Angeles, California 90067
Telephone: (310) 712-6600

Aviv S. Halpern (SBN 327100)
halperna@sullcrom.com
**SULLIVAN & CROMWELL LLP**
550 Hamilton Avenue
Palo Alto, California 94301
Telephone: (650) 461-5600

Daniel M. Cislo (SBN 125378)
dan@cislo.com
Katherine M. Bond (SBN 263020)
kbond@cislo.com
**CISLO & THOMAS LLP**
12100 Wilshire Blvd., Ste. 1700
Los Angeles, CA 90025
Telephone: (310) 979-9190

*Attorneys for Plaintiff Pepperdine University*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PEPPERDINE UNIVERSITY,<br><br>Plaintiff,<br><br>v.<br><br>NETFLIX, INC. and WARNER BROS. ENTERTAINMENT<br><br>Defendants. | Case No. 25-1429<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: ENTRY OF PRELIMINARY INJUNCTION**<br><br>Date:<br>Time:<br>Courtroom: |

# TABLE OF CONTENTS


**Page**

I. PRELIMINARY STATEMENT ..... 1

II. STATEMENT OF FACTS ..... 4

A. Pepperdine's Registered and Common Law Trademark Rights. ..... 4

B. Defendants' *Running Point* Series Uses Pepperdine's Marks Without Permission. ..... 5

C. Defendants' Uses Do Not Align With Pepperdine's Morals And Values. ..... 9

D. Pepperdine Diligently Has Attempted To Resolve This Dispute Outside Of Court. ..... 10

III. LEGAL STANDARD ..... 11

IV. ARGUMENT ..... 12

A. Pepperdine Is Likely To Succeed On The Merits Of Its Trademark Infringement And False Designation Of Origin Claims. ..... 12

1. Pepperdine Has Valid And Protectable Rights In The WAVES Marks. ..... 13

2. Pepperdine Will Establish A Likelihood Of Confusion Based On Defendants' Actual Use And Based On The Context Of Use. ..... 14

B. At Minimum, A TRO Is Warranted Because There Are Serious Questions Going To The Merits And The Remaining *Winter* Factors Weigh Sharply In Pepperdine's Favor. ..... 19

1. Absent Injunctive Relief, Pepperdine Will Suffer Irreparable Harm. ..... 19

2. The Balance of Hardship Weighs In Pepperdine's Favor. ..... 20

3. An Injunction Would Serve The Public's Interest. ..... 21

4. No Bond Should be Required. ..... 22

V. CONCLUSION ..... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1915 Panama Pac. Int'l Exposition Inc.* v. *Panama Pac. Int'l Exposition Org. Comm.*, 2024 WL 5185340 (C.D. Cal. Nov. 14, 2024) ..... 11

*AMF, Inc.* v. *Sleekcraft Boats*, 174 F.3d (9th Cir. 1979) ..... 13, 14, 16

*Aurora World* v. *Ty, Inc.*, 719 F. Supp. 2d 1115 (C.D. Cal. 2009) ..... 13

*Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll.* v. *Smack Apparel Co.*, 550 F.3d 465 (5th Cir. 2008) ..... 21

*Beer Nuts* v. *Clover Club Foods Co.*, 805 F.2d 920 (10th Cir. 1986). ..... 16

*Berg* v. *Cnty. of Los Angeles*, 2021 WL 4691154 (C.D. Cal. May 28, 2021) ..... 11

*Brookfield Comms.* v. *W. Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999) ..... 21

*Cazorla* v. *Hughes*, 2014 WL 12235425 (C.D. Cal. Apr. 7, 2014) ..... 15

*Cisco Sys., Inc.* v. *Shenzhen Usource Tech. Co.*, 2020 WL 5199434 (N.D. Cal. Aug. 17, 2020) ..... 11, 18

*eBay, Inc.* v. *Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058 (N.D. Cal. 2000) ..... 19

*El Pollo Loco, Inc.* v. *Hashim*, 316 F.3d 1032 (9th Cir. 2003) ..... 18

*Friends of the Wild Swan* v. *Weber*, 767 F.3d 936 (9th Cir. 2014) ..... 11

*Fuddruckers, Inc.* v. *Doc's B.R. Others, Inc.*, 826 F.2d 837 (9th Cir. 1987) ..... 12

*Grupo Bimbo, S.A.B. de C.V.* v. *Snak-King, Corp.*, 2013 WL 12133892 (C.D. Cal. July 22, 2013) ..... 13

*Gucci Am., Inc.* v. *Los Altos Boots, Inc.*, 2014 WL 12561613 (C.D. Cal. Aug. 27, 2014) ..... 19

*Idaho* v. *Coeur d'Alene Tribe*,
794 F.3d 1039 (9th Cir. 2015) ....................................................................................11

*Jorgensen* v. *Cassiday*,
320 F.3d 906 (9th Cir. 2003) ......................................................................................21

*Kahala Franchising, LLC* v. *Real Faith, LLC*,
2022 WL 1605377 (C.D. Cal. May 20, 2022) ...............................................................18

*Kreation Juicery, Inc.* v. *Shekarchi*,
2014 WL 7564679 (C.D. Cal. Sept. 17, 2014) ..............................................................20

*Lahoti* v. *VeriCheck, Inc.*,
586 F.3d 1190 (9th Cir. 2009) ....................................................................................12

*Ocean Garden, Inc.* v. *Marktrade Co.*,
953 F.2d 500 (9th Cir. 1991) ......................................................................................13

*Phillip Morris USA Inc.* v. *Shalabi*,
352 F. Supp. 2d 1067 (C.D. Cal. 2004) ......................................................................21

*Playboy Enters., Inc.* v. *Baccarat Clothing Co.*,
692 F.2d 1272 (9th Cir. 1982) ..................................................................................9, 21

*Pom Wonderful LLC* v. *Hubbard*,
775 F.3d 1118 (9th Cir. 2014) ....................................................................................12

*Rockport Admin. Servs., LLC* v. *Integrated Health Sys., LLC*,
2023 WL 5667867 (C.D. Cal. June 26, 2023) ...............................................................11

*Steinway & Sons* v. *Robert Demars & Friends*,
1981 WL 40530 (C.D. Cal. Jan. 28, 1981) ...................................................................19

*Tari Labs, LLC* v. *Lightning Labs, Inc.*,
2023 WL 2480739 .....................................................................................................21

*U.S. Olympic Comm.* v. *Xclusive Leisure & Hosp. Ltd.*,
2008 WL 3971120 (N.D. Cal. Aug. 25, 2008) ..............................................................20

*Vertos Med., Inc.* v. *Globus Med., Inc.*,
2009 WL 3740709 (N.D. Cal. Nov. 6, 2009) ................................................................14

*VIP Prods. LLC* v. *Jack Daniel's Properties Inc.*,
2025 WL 275909 (D. Ariz. Jan. 23, 2025) ...............................................................14, 15

*Vision Wheel, Inc.* v. *Lightning Labs, Inc.*,
732 F. Supp. 3d 1161 (C.D. Cal. 2024) ......................................................................11

*Winter* v. *Natural Res. Defense Council, Inc.*,
555 U.S. 7 (2008)..............................................................................................11, 18, 19

**Statutes**

15 U.S.C. § 1065 .......... 12

15 U.S.C. § 1114 .......... 12

15 U.S.C. § 1116 .......... 18

15 U.S.C. § 1125 .......... 14, 15

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. PRELIMINARY STATEMENT

In seven days—on February 27, 2025—Defendants Netflix, Inc. ("Netflix") and Warner Bros. Entertainment ("Warner Bros.") will release on the Netflix streaming platform a raunchy comedy, called *Running Point*, that infringes on Pepperdine University's ("Pepperdine") trademarks and tarnishes its reputation. Pepperdine respectfully asks the Court for immediate relief to stop the Defendants from releasing the show on the scheduled date and preserve the status quo until the issues can be fully addressed by the Court on a full record.

Defendants describe the show as being about an ambitious protagonist appointed as president of a purportedly fictional Los Angeles-based basketball team called the "Waves" and, as described in the series trailer, the "fucked up family that runs it." This Series infringes multiple Pepperdine trademarks, and it's offensiveness threatens Pepperdine's reputation. All of Pepperdine's athletic teams, including its basketball team, have been called the "Waves" for decades, and Pepperdine has several registered trademarks to protect this brand precisely for sports, entertainment and associated goods and services such as clothing. Defendants blatantly appropriated these marks, as can be seen below.



Defendants' Use



Pepperdine's Mark

In addition, many of the show's themes are at odds with Pepperdine's mission and reputation. Pepperdine is an elite Christian university with strong religious and moral values. Given that the series, at least as depicted in its trailer, includes themes of excessive alcohol and substance use and

abuse, sexual innuendo and imagery, and foul language, its release and unauthorized affiliation with the Pepperdine's brands will do grave and irreparable harm to the university. As just one example from the trailer, the protagonist, played by Kate Hudson, is depicted topless, with a shirt bearing Pepperdine's registered mark ("WAVES") lowered to her waist. Unless immediately stopped, the show irretrievably ties Pepperdine's brand to themes and imagery that are anathema to the university's values and mission, and creates an association that Pepperdine did not authorize and fully rejects.




Defendants' Use

Founded in Los Angeles in 1937, Pepperdine is a prestigious, non-profit, Christian university with top-ranked undergraduate and graduate programs. And its athletic programs are no exception. Since its founding, Pepperdine's athletic teams—the "Waves"—have participated widely and excelled in various National Collegiate Athletic Association ("NCAA") sports. The Waves have won ten Division I NCAA team championships in five different sports. Its men's basketball team has been competing since the 1938-1939 season, is currently in Division I of the NCAA, and it has at least 33 former players that have been drafted by the NBA and one former player inducted to the Naismith Memorial Basketball Hall of Fame.

Having used its WAVES marks in commerce for over *eight decades*, the marks have become strongly associated with Pepperdine as an institution and the teams, programs, merchandise, and

messaging that it endorses or sponsors. This is especially true when used in conjunction with Los Angeles, and with Pepperdine's official school colors of blue and orange that were similarly adopted in 1937. And given their longstanding and continuous use, the WAVES marks registered by Pepperdine at the U.S. Trademark Office have become incontestable. Defendants have appropriated all of these characteristics in combination: the name, the city, the color palette, and more.

Defendants' fictionalized series, *Running Point*, purports to be loosely based on the famed owner of the Los Angeles Lakers, Jeanie Buss, who is also an executive producer of the series. And although Defendants could have chosen any number of names for their purportedly fictional team, located the team in any city, and used any number of color combinations for their uniforms—including colors and branding based on the Lakers, the rights to which Ms. Buss likely controls or has the ability to license—Defendants inexplicably chose to use Pepperdine's identifying characteristics across the board. There are too many similarities for the Defendants' infringement to be inadvertent.

Pepperdine stands to suffer irreparable harm at least to its rights in its distinctive and famous WAVES marks unless the Court restrains Defendants from their imminent release of the *Running Point* series. Absent injunctive relief, Defendants are likely to succeed in creating an unwanted association between the Los Angeles Waves depicted in *Running Point* and the Los Angeles-based Pepperdine Waves—diluting the value of Pepperdine's protected trademarks and tarnishing the reputation and goodwill associated with Pepperdine's brand that have been carefully built for over eight decades.

Pepperdine first learned of Defendants' use of its protected trademarks on January 30, 2025, when it saw the trailer for *Running Point*. Pepperdine promptly contacted Defendants about this issue, but, despite some correspondence and communications over a few weeks, Defendants have declined to address Pepperdine's concerns. Pepperdine understands that Defendants do not plan on making any changes to their uses of Pepperdine's trademarks, and Defendants plan to release the *Running Point* series as scheduled on February 27.

Because Defendants' misappropriation of Pepperdine's registered marks in *Running Point* is so undeniable and pervasive, Pepperdine requests that the Court enter a temporary restraining order barring Defendants from releasing their series utilizing Pepperdine's marks until a preliminary injunction motion can be heard on regular notice on this Court's next available hearing date. Preserving the status

quo will impose no significant or unfair hardship on Defendants, as the series is not a theatrical release or other offering for which Defendants will charge specific fees, but is scheduled to be released to already existing Netflix subscribers who will not be paying any additional fees for access to the series. Defendants also remain free to release *Running Point* if they remove Pepperdine's intellectual property. On the other hand, allowing the show to be released before the issues are fully adjudicated will cause irreparable harm to Pepperdine, as the infringement, messaging and imagery will already have been distributed to the public.

## II. STATEMENT OF FACTS

For more than 87 years, the term "Waves" has been associated with Pepperdine University, as have its distinctive school colors, blue and orange. Declaration of Sean Burnett ("Burnett Decl.") ¶ 3. Pepperdine owns several incontestable federal registrations for its WAVES trademarks, as well as several common law trademark rights such as in the name in conjunction with its distinctive school colors and other symbols that are associated with and identify the university—like jerseys with the number "37," a reference to the year Pepperdine was founded. Burnett Decl. ¶ 6. Pepperdine's longstanding and widespread use of its marks nationally and regionally have made the marks famous and caused the public to associate them with Pepperdine University.

### A. <u>Pepperdine's Registered and Common Law Trademark Rights.</u>

Pepperdine owns three incontestable trademarks related to WAVES. Declaration of Aviv S. Halpern ("Halpern Decl.") ¶ 2.

WAVES
U.S. Reg. No. 2,668,597
(Incontestable)

WAVES
U.S. Reg. No. 2,903,783
(Incontestable)

PEPPERDINE WAVES
U.S. Reg. No. 2,967,811
(Incontestable)

In addition, it owns several common law trademarks, as previewed above, inextricably linked to Pepperdine's spirit, tradition, and brand. Burnett Decl. ¶ 6. Since 1937, Pepperdine has put its marks to continued and prominent use—from use at national sporting events and competitions, official university communications and merchandise, graduation ceremonies, and various community gatherings.

*Id.* Pepperdine has invested significant amounts of money in its marketing, advertising, and branding. Burnett Decl. ¶ 10. It also has substantial sales of merchandise bearing its trademarks, its color palette, and often the number "37," which it sells online directly and through third parties, and directly through at least two brick-and-mortar stores in different areas of Los Angeles. *Id.* *See Pepperdine Bookstore*, PEPPERDINE, https://www.bkstr.com/pepperdinestore/shop/clothing-accessories (last visited Feb. 20, 2025).










Through its longstanding and prominent use of its marks nationally and in the Southern California region, and through its extensive advertising and sales, substantial goodwill has been developed in the WAVES marks. *See* Burnett Decl. ¶ 11. The marks are widely recognized as an indication that Pepperdine is the source or licensor of products bearing those marks, and they are strongly associated in the minds of consumers with Pepperdine and its core mission and values. *See id.* Further, Pepperdine regularly polices uses of its mark—having sent cease-and-desist letters to infringing entities (including some related to the WAVES marks), and having licensed others for limited uses of Pepperdine's marks in other fields of use. *See* Burnett Decl. ¶ 9.

### B. Defendants' *Running Point* Series Uses Pepperdine's Marks Without Permission.

On January 30, 2025, Defendants released a trailer for their series, *Running Point*, and the WAVES marks owned by Pepperdine are featured prominently, as shown in the exemplary images below comparing Defendants' use with Pepperdine's marks. *See* Halpern Decl. ¶ 3. Defendants' uses are nearly identical to Pepperdine's marks—they have exact same name, they use a similar font and color palette, and they are generally used in similar contexts (*i.e.*, to refer to a sports team and its environment).



Defendants' Use




Pepperdine's Mark



Defendants' Use

Pepperdine's Mark




Defendants' Use




Pepperdine's Mark




Defendants' Use




Pepperdine's Mark




Defendants' Use




Pepperdine's Mark




Defendants' Use




Pepperdine's Mark

Beyond just the similarity between the marks, the context of Defendants' uses are also strikingly similar and are intended to reach similar audiences. The "Waves" in Defendants' series refers to a basketball team, and Pepperdine's basketball team is called the "Waves." The "Waves" in Defendants' series are based in Los Angeles, and so are the Pepperdine Waves. The "Waves" conference room in Defendants' series has a framed blue, orange, and white "37" jersey, strikingly similar to the "37" Jersey that Pepperdine's mascot wears (and the jerseys most often sold by Pepperdine), a reference to the year that Pepperdine was founded—1937.




Defendants' Use







Pepperdine's Mark

And Defendants' series also displays several images of Malibu in its trailer, and Pepperdine is well-known, in part, because of its location in Malibu.




Image from the *Running Point* trailer.




Image from Pepperdine University.

It is inconceivable that Defendants were unaware of Pepperdine's marks when they misappropriated them for use in their series. The copying is too complete to be coincidental, even down to the number displayed on the jersey worn by Pepperdine's mascot. Indeed, for years Pepperdine maintained a conference room at Staples Center, home of the Lakers, displaying its branding including jerseys with the Waves mark. Burnett Decl. ¶ 12.

Additionally, sophisticated entertainment entities like Netflix and Warner Bros. must know of their obligations to clear intellectual property rights, and a basic search of the U.S. trademark register would have revealed Pepperdine's ownership of the WAVES marks. Also, a simple web search for "what basketball teams are in Los Angeles" immediately identifies the Pepperdine Waves. Halpern Decl. ¶ 5.




And a web search for "Los Angeles waves basketball" immediately results in numerous Pepperdine Waves-related articles and sources. Halpern Decl. ¶ 6. Had Defendant conducted even a simple search on the name of their "fictional" team, they would have been on notice of the well-publicized and popular WAVES marks and basketball team.




### C. <u>Defendants' Uses Do Not Align With Pepperdine's Morals And Values.</u>

Based on the trailer, the story depicted in the *Running Point* series includes themes of

excessive alcohol and substance use, sexual innuendo and imagery, foul language, as well as other offensive themes that are anathema to the values that Pepperdine stands for and promotes. Burnett Decl. ¶ 14. For example, in the trailer, the character portrayed by Kate Hudson, the star of the series, is heard stating that she "might have a Xani on the plane." *Id.* There is also sexually suggestive dialogue, such as "I seen your titties on the internet so I can't really take you serious" and "everyone is horny for everyone they work with." *Id.* The trailer even includes a topless photo of Kate Hudson with Plaintiff's WAVES mark shown prominently pulled down to her waist—perhaps intending to reflect the time that Jeanne Buss posed for *Playboy*. *Id.*

As an alcohol- and drug-free university, with few exceptions, it is a violation of Pepperdine's Student Code of Conduct for any student to be in the presence of alcohol, controlled substances, or drug-related paraphernalia on any of Pepperdine's campuses. Burnett Decl. ¶ 5. Needless to say, Pepperdine does not wish to be tied to the messages and imagery of *Running Point*. Burnett Decl. ¶¶ 14-15.

**D. <u>Pepperdine Diligently Has Attempted To Resolve This Dispute Outside Of Court.</u>**

Prior to bringing this action, Pepperdine reached out to Defendants to determine whether there was a means to address these issues informally. Defendants did not engage meaningfully. *See* Halpern Decl. ¶¶ 8-12. The only communication has been from a Warner Bros. in-house attorney who dismissed Pepperdine's concerns and stated that the *Running Point* writers were "inspired by the Southern California vibe," that the show's "font/logo was an original creation of [its] Art Director," and that the framed "37" jersey was "randomly" chosen as a "number[] that [was] not tied to actual Lakers players." Halpern Decl. ¶ 9. But "the Southern California vibe" can be represented in myriad ways without appropriating Pepperdine's precise team name, its color palette and even its mascot's jersey that references its founding year. And the suggestion that this was an "original creation" strains credulity for studios that exist in Los Angeles and interact with Pepperdine and its students, alumni and brands. Indeed, it has been reported that Mindy Kaling, the show's primary writer, recently bought Frank Sinatra's Malibu home, mere steps from the Pepperdine campus. Cydney Contreras, *Mindy Kaling Buys Frank Sinatra's Malibu Mansion for Nearly $10 Million*, E: ONLINE (Feb. 26, 2020), https://www.eonline.com/news/1126378/mindy-kaling-buys-frank-sinatra-s-malibu-mansion-for-nearly-10-million. And one need only

look at a comparison of Pepperdine's long-standing uses of its Waves marks and the show's copy-cat images to know that the font and logo used by Defendants was not an "original" creation.

On or about February 10, 2025, Pepperdine's General Counsel called the Netflix General Counsel to open a dialogue about Pepperdine's concerns with the show. Halpern Ex. 8. Netflix never responded, but instead a Warner Bros. in-house attorney called the day after. Halpern Decl. ¶¶ 8-9; *see* Halpern Ex. F. After that conversation and an email exchange, Halpern Ex. F, on February 12, 2025, Pepperdine's outside counsel sent a cease and desist letter. Halpern Ex. G. Having received no response, on February 17, 2025, Pepperdine's outside counsel sent a follow-up letter. Halpern Ex. H. To date, Pepperdine has still not received a formal response to its letters.

On February 14, 2025, Warner Bros.'s in-house counsel invited Pepperdine's general counsel for a screening of the first two episodes of the *Running Point* series, which he accepted. Halpern Ex. F. Then, on February 18, Warner Bros. cancelled the scheduled pre-screening—stating that in light of its "receipt of the attached [follow-up cease and desist letter] . . . the Studio has decided it's best to cancel the pre-screening." *Id.* ¶ 9. Pepperdine's general counsel responded on February 19, expressing disappointment and offering to continue conversations to explore paths to resolution. Halpern Ex. F.

On February 19, 2025, Warner Bros. outside counsel sent Pepperdine's outside counsel a non-substantive response to the cease-and-desist letters, indicating that they "ha[d] just been retained" and that they were "discussing the matter with [their] client." Halpern Ex. I.

As of the date of this filing, Pepperdine has not received any indication that Defendants intend to delay the February 27 release of, or make any changes to, the *Running Point* series to address Pepperdine's concerns about the use of its marks. *Id.* As a result, with time running out, Pepperdine has no choice but to seek the Court's assistance.

## III. LEGAL STANDARD

The standard for issuing a TRO is the same as that for the issuance of preliminary injunction. *Cisco Sys., Inc.* v. *Shenzhen Usource Tech. Co.*, 2020 WL 5199434, at *6 (N.D. Cal. Aug. 17, 2020) (citing *Stuhlbarg Int'l Sales Co., Inc.* v. *John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)). Specifically, the moving party must establish that: "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in

its favor; and (4) an injunction is in the public interest." *Idaho* v. *Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) (internal quotation marks omitted); *see also Winter* v. *Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008). And, in the Ninth Circuit, "if a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan* v. *Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (cleaned up and emphasis removed).

Preliminary injunctions are "routinely granted" in trademark infringement cases based on the "well-settled" and "universally recognized" principle that "trademark infringement causes irreparable injury and necessitates immediate injunctive relief." *Cisco Sys.*, 2020 WL 5199434, at *6.[1] And plaintiffs may provide a broad range of evidence to support an injunction and "may give even inadmissible evidence some weight, when to do so serves [the] purpose of preventing irreparable harm before trial." *Berg* v. *Cnty. of Los Angeles*, 2021 WL 4691154, at *2 n.3 (C.D. Cal. May 28, 2021) (citation omitted). The same is true for TROs where time is of the essence. *Rockport Admin. Servs., LLC* v. *Integrated Health Sys., LLC*, 2023 WL 5667867, at *2 (C.D. Cal. June 26, 2023).

And to prevail on a trademark infringement claim, the plaintiff must establish that (1) it has a valid, protectable trademark; and (2) the alleged infringer's use of the same or a similar mark causes a likelihood of confusion in the minds of the relevant consuming public. *Fuddruckers, Inc.* v. *Doc's B.R. Others, Inc.*, 826 F.2d 837, 841 (9th Cir. 1987).

## IV. ARGUMENT

All of the factors necessary for preliminary injunctive relief are present in this case. We address each in turn.

### A. <u>Pepperdine Is Likely To Succeed On The Merits Of Its Trademark Infringement And False Designation Of Origin Claims.</u>

Pepperdine is likely to succeed on its claims for trademark infringement and false

[1] Courts in this judicial district and elsewhere have granted preliminary injunctive relief or TROs to prevent the infringement of trademark rights. *E.g.*, *1915 Panama Pac. Int'l Exposition Inc.* v. *Panama Pac. Int'l Exposition Org. Comm.*, 2024 WL 5185340, at *1 (C.D. Cal. Nov. 14, 2024) (granting preliminary injunction); *Vision Wheel, Inc.* v. *Lightning Labs, Inc.*, 732 F. Supp. 3d 1161, 1163 (C.D. Cal. 2024) (granting TRO); *Cisco Sys.*, 2020 WL 5199434, at *5 (TRO).

designation of origin under Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a)[2], because it has valid, protectable rights in the WAVES marks and because Defendants' unauthorized use of the marks is likely to cause confusion as to the source, sponsorship, or affiliation of the products in the marketplace. *See Lahoti* v. *VeriCheck, Inc.*, 586 F.3d 1190, 1196 (9th Cir. 2009); *see also* 15 U.S.C. § 1114(1).

**1. Pepperdine Has Valid And Protectable Rights In The WAVES Marks.**

Pepperdine owns three federally registered trademarks, which are incontestable pursuant to Section 15 of the Lanham Act, *see* 15 U.S.C. § 1065, as well as common law trademark rights against Defendants. Each of Pepperdine's marks is valid and protectable.

As an initial matter, "[r]egistration of a mark is prima facie evidence of the validity of the mark, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in connection with the goods specified in the registration." *Pom Wonderful LLC* v. *Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014) (citing 15 U.S.C. § 1115(a)). Here, Pepperdine owns federally registered trademarks Reg. Nos. 2,668,597, 2,903,783, and 2,967,811.[3] Where, as here, the proof of registration for the three federally registered trademarks is uncontested, the ownership interest element is met. *See id.*

Moreover, Pepperdine's registered marks are designated as "incontestable" based on their longstanding use and registration. *See* 15 U.S.C. § 1065; Halpern Exs. A-C (including incontestability declaration and acknowledgment from U.S. Trademark Office). This is conclusive evidence that Pepperdine's marks are distinctive and valid. *See* 15 U.S.C. § 1115(b).

Pepperdine's registered marks cover a variety of relevant classes. In particular, all three registered marks are in "class 41" for, among other things, "entertainment services, . . . [and] arranging and conducting athletic events and tournaments"; and Reg. Nos. 2,903,783 and 2,967,811 are also in "class 25" for, among other things, "clothing, namely, tee-shirts, sweatshirts, sweatpants, hats, . . . tank-

[2] As alleged in the Complaint, there are other claims upon which Pepperdine is likely to succeed, including dilution of our famous marks, unfair business practices and competition, and false advertising. *See* Complaint ¶¶1-134. In the interest of simplifying the issues for expedited relief, this Motion is limited. Pepperdine reserves all rights and will address these rights in full should this case proceed to preliminary injunction.

[3] As alleged in the Complaint, Pepperdine also owns common law trademark rights in the "Waves" name, its school colors, and combinations of its school colors with indicia associated with the university. For simplicity and for the purpose of this motion, Pepperdine does not address the infringement of those rights at this time. Pepperdine will address these rights in full should this case proceed to a preliminary injunction.

tops, and shorts." Halpern Exs. A-C. Defendants' uses of the WAVES marks are precisely in these classes of goods and services.

**2. There Is A Likelihood Of Confusion Based On Defendants' Actual Use And Based On The Context Of Use.**

The Ninth Circuit weighs the eight *Sleekcraft* factors in evaluating whether an allegedly infringing mark is likely to cause confusion in the marketplace: (a) strength of the mark; (b) similarity of the marks; (c) proximity or relatedness of the goods; (d) evidence of actual confusion; (e) marketing channels used; (f) types of goods and degree of care likely to be exercised by the consumer; (g) Defendant's intent to select the mark; and (h) likelihood of expansion of product lines. *AMF, Inc.* v. *Sleekcraft Boats*, 174 F.3d at 1052 n.15 (9th Cir. 1979). The Court is not required to address all of the factors, nor do Plaintiffs need to prevail on every one. *See Aurora World* v. *Ty, Inc.*, 719 F. Supp. 2d 1115, 1156 (C.D. Cal. 2009) (court need not consider all the *Sleekcraft* factors at the preliminary injunction stage). Here, all the factors point to a strong likelihood of confusion.

**a. Pepperdine's WAVES Marks Are Strong.**

Because Pepperdine's marks are incontestable, and thus presumed to be inherently distinctive, they are entitled to the strongest scope of protection. *See Grupo Bimbo, S.A.B. de C.V.* v. *Snak-King, Corp.*, 2013 WL 12133892, at *7 (C.D. Cal. July 22, 2013) (TAKIS trademark was incontestable, "[t]hus, the TAKIS mark is likely at least suggestive and therefore conceptually strong"); *Ocean Garden, Inc.* v. *Marktrade Co.*, 953 F.2d 500, 506 (9th Cir. 1991) (strong mark "will be afforded the widest ambit of protection from infringing uses"). As discussed above, Pepperdine's marks have acquired strength by virtue of their 87 years of widespread use, of the national attention paid to Pepperdine due to its top-ranked academics and sports, and of its substantial investments in advertising, marketing, promotion, and sales of branded materials. *See* Burnett Decl. ¶¶ 6, 7, 10. Further, over the years, Pepperdine has engaged with accused infringers to enforce its rights, including with respect to the WAVES marks. Burnett Decl. ¶ 9. The marks are particularly strong with respect to Los Angeles-area basketball, as they represent the only collegiate or professional basketball team with this name in this county for decades.

**b. Defendants' Uses Are Identical Or Nearly Identical To Pepperdine's Marks.**

The WAVES marks feature prominently in Defendants' *Running Point* trailer and likely

throughout the series. Defendants use the word "WAVES," which is identical to Pepperdine's WAVES marks. Defendants use the word "Waves" in conjunction with the same color palette as Pepperdine's school colors[4], and in the same or a strikingly similar font. "The greater the similarity between the two marks, the greater the likelihood of confusion." *Vertos Med., Inc.* v. *Globus Med., Inc.*, 2009 WL 3740709, at *6 (N.D. Cal. Nov. 6, 2009) (internal citation omitted). And they are used in similar contexts—on athletic clothing, gymnasiums, basketball games and tournaments, and other goods and services that refer to a Los Angeles-based basketball team.

**c. The Parties' Goods Are Clearly Related.**

If the goods are related, the "the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Sleekcraft*, 599 F.2d at 350. Here, there is significant danger in the public assuming an association given the similarities in the context of Defendants' use—same team name, same color palette, in Los Angeles, highlighting Malibu imagery, and same "37" Jersey given special prominence.

It is of no matter that Defendants are depicting an athletics team on film rather than running an actual athletics team because consumers are likely to confuse both the source of origin and whether Pepperdine is associated with, sponsored, or approved of the Waves basketball team in the series. *See* 15 U.S.C. § 1125(a); *see also VIP Prods. LLC* v. *Jack Daniel's Properties Inc.*, 2025 WL 275909, at *26 (D. Ariz. Jan. 23, 2025) (granting permanent injunction where a dog-toy company used plaintiff's mark in a manner that created an association between the two marks). Consumers are likely to draw an association between the fictional Los Angeles Waves and actual Pepperdine Waves given the vast number of sports-related shows about actual teams.[5] And the danger of confusion stemming from this association is even more likely once viewers conduct a simple online search for "Los Angeles waves basketball team," leading directly to results associated with Pepperdine. Halpern Decl. ¶ 6.

It also does not matter that the Waves in *Running Point* are a professional team while the Pepperdine Waves are a college team. The context of an infringing use does not have to be identical to

---

[4] *See Official Colors*, PEPPERDINE UNIVERSITY https://community.pepperdine.edu/imc/resources/style-guide/official-colors/ (last accessed Feb. 19, 2025).

[5] A classic example is the Mighty Ducks and the Anaheim Ducks. Dillon Baker, *The Mighty Ducks: The Story Behind the NHL Team That Doubled As An All-Time Great Marketing Stunt*, CONTENTLY (Mar. 19, 2015), https://contently.com/2015/03/19/the-mighty-ducks-the-story-behind-the-nhl-team-that-doubled-as-an-all-time-great-marketing-stunt/.

be confusing. *See VIP Prods. LLC* v. *Jack Daniel's Properties Inc.*, 2025 WL 275909, at *26 (D. Ariz. Jan. 23, 2025) (granting permanent injunction where dog toy company used the "Jack Daniel's" mark in a confusingly similar way that could harm Jack Daniel's reputation or confuse consumers, even if the uses are different). Even if the teams play in different leagues, at the very minimum there is a strong likelihood of confusion here as to sponsorship, affiliation, or endorsement. *See* 15 U.S.C. § 1125 (defining actionable types of confusion to include "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person"); *Cazorla* v. *Hughes*, 2014 WL 12235425, at *21 (C.D. Cal. Apr. 7, 2014) ("Even if the defendant never posts damaging material, the Court agrees with the plaintiff that the use of the plaintiff's name . . . 'create[s] a likelihood of confusion as to the source, sponsorship, affiliation and endorsement of those sites'"). After all, Pepperdine's trademark registrations are for all athletic events and not limited to a particular league.

Here, the team depicted in the show has the same name, font and color palette, and plays in the same city, as the Pepperdine teams, and even highlights the same jersey number as used by the Pepperdine mascot. Burnett Decl. ¶ 8. The goods and services are so closely related that it is only natural to (mistakenly) assume that Pepperdine—the rightful owner of these brands—sponsored or licensed the show.

**d. There Is Actual Evidence Of Confusion And Further Confusion Is Likely.**

Based on the trailer alone, there have been at least some instances of consumers online noticing the overlap. Halpern Decl. ¶ 4 (displaying social media post of user pointing out the similarities between the Pepperdine Waves logo and the *Running Point* use, stating "[d]id nobody at Netflix think to check whether someone (anyone!) already held a trademark on that particular WAVES logo in blue and orange?"). And there will likely be a lot more actual confusion once the show is released. In any event, evidence of *actual* confusion is not necessary to show a *likelihood* of confusion. *E.g.*, *Beer Nuts* v. *Clover Club Foods Co.*, 805 F.2d 920, 928 (10th Cir. 1986).

**e. The Parties' Marketing Channels Overlap.**

Under *Sleekcraft*, convergent marketing channels increase the likelihood of confusion. Both parties use the same marketing channels and are directed to the same or similar audiences (sports

fans). *See* Burnett Decl. ¶ 10. Defendants and Pepperdine use social media and other online media, websites, print advertising, press releases, and direct sales efforts. *See id.* Like Pepperdine, *see id.*, Netflix even has an online store where it sells direct-to-consumer merchandise related to various shows that it streams. *Netflix Shop*, NETFLIX, https://www.netflix.shop/ (last visited Feb. 18, 2025).

**f. Being A TV Show, Confusion Is More Likely.**

The item at issue here is a TV show to be streamed on the Netflix platform. Netflix subscribers do not pay per title that they view, and once subscribed, there is no additional charge for this show. *See What Is Netflix*, Netflix, https://www.netflix.com/ (last accessed Feb. 19, 2025). All a subscriber needs to do is click and watch the show. Unlike the purchase of an expensive item (e.g., a luxury watch), the Netflix subscriber does not need to investigate whether the Los Angeles Waves basketball team depicted in the show is authentic. Subscribers will view the show and make incorrect assumptions based on the obvious connections to Pepperdine's name and branding. It is well-established that consumers of relatively inexpensive goods do not exercise a high level of purchasing care, thus making confusion between similar goods more likely. *See Brookfield Commc'ns, Inc.* v. *W. Coast Ent. Corp.*, 174 F.3d 1036, 1060 (9th Cir. 1999).

**g. The Evidence Suggests An Intent To Select The Mark.**

The sheer number of similarities between the Los Angeles Waves in *Running Point* and Pepperdine's Waves is too great for there not to have been an intent to select the mark. Indeed, even the slightest amount of diligence—a simple online search—immediately reveals that Pepperdine has already had a basketball team in Los Angeles with the same name and the same colors ***for over 87 years***. Halpern Decl. ¶ 5. The same is true with a search of the U.S. trademarks register. Halpern Decl. ¶ 7 (a search for "Waves" among registered trademarks results in two of Pepperdine's WAVES marks).

There are other reasons that suggest intent. For years, Pepperdine prominently displayed several of its WAVES marks in a conference room at the Staples Center (now Crypto.com Arena)—the home of the Lakers and accessible to Jeanie Buss and her team. Burnett Decl. ¶ 12. Pepperdine displayed its jersey, together with the Waves name and colors, as depicted below.




Pepperdine's Conference Room at Staples Center

In addition, several Pepperdine alumni have gone to work at Netflix, Warner Bros., and the Lakers. Burnett Decl. ¶ 13. Several former Pepperdine Waves basketball players have even gone on to play basketball for the Lakers. *Id.* It is hard to imagine that none of the many writers, producers, crew, attorneys and others at the various companies involved with the show were not aware of Pepperdine's intellectual property.

Defendants were also informed of the Asserted Trademarks and their infringement shortly after Pepperdine learned of the infringement from the release of the *Running Point* trailer. Halpern Decl. ¶¶ 8-12. But Defendants still apparently plan to release the show with full knowledge of their infringement. Halpern Decl. ¶ 13. Irrespective of what they knew beforehand, Defendants now clearly intend to release the show in full knowledge of Pepperdine's trademarks and infringement allegations.

**h. There Is A Strong Likelihood of Expansion Of Product Lines**

Besides the trailer, Defendants plan to release ten episodes for the series that will likely span approximately 300 minutes (5 hours) of television. The infringing uses of Pepperdine's marks will be vast, reaching at least tens of millions of viewers across the United States and internationally. *See* Company Profile, NETFLIX: INVESTORS, https://ir.netflix.net/ir-overview/profile/default.aspx (last accessed Feb. 19, 2025). (Netflix has approximately 300 million paid subscribers worldwide). In addition, and if they follow their prior practices, Defendants may also sell merchandise with the fictional Los Angeles Waves logos, in further violation of Pepperdine's trademarks. Netflix, for example, maintains a store where it sells merchandise associated with some of its shows. *Netflix Shop*, NETFLIX, https://www.netflix.shop/ (last visited Feb. 18, 2025). Unless enjoined, Defendants will vastly expand

their infringement starting on February 27, 2025, causing additional confusion and harm to Pepperdine.

**B. <u>At Minimum, A TRO Is Warranted Because There Are Serious Questions Going To The Merits And The Remaining *Winter* Factors Weigh Sharply In Pepperdine's Favor.</u>**

**1. Absent Injunctive Relief, Pepperdine Will Suffer Irreparable Harm.**

An injunction here temporarily preserves the status quo. If Defendants are permitted to release the *Running Point* series, it will cause irreparable harm to Pepperdine, its overall brand, and its WAVES marks.

As an initial matter, under 15 U.S.C. § 1116, a trademark owner is presumed to be irreparably harmed when it demonstrates a likelihood of success in proving infringement. *Kahala Franchising, LLC* v. *Real Faith, LLC*, 2022 WL 1605377, at *4 (C.D. Cal. May 20, 2022) ("Given that [Plaintiff] demonstrates a likelihood of success on its trademark infringement claim, [Plaintiff] is statutorily entitled to a presumption of irreparable harm for the purposes of its request for a preliminary injunction") (citing 15 U.S.C. § 1116(a)); *El Pollo Loco, Inc.* v. *Hashim*, 316 F.3d 1032, 1038 (9th Cir. 2003). Under this presumption, "[p]reliminary injunctions are routinely granted in cases involving trademark infringement." *Cisco Sys.*, 2020 WL 5199434, at *6 .

Even without such a presumption, Defendants' continued infringement will cause actual and significant irreparable harm to Pepperdine and its WAVES marks. It will forever associate Pepperdine's WAVES mark with a show whose apparent messaging and themes are antithetical to those espoused by the university—causing it to lose value in the eyes of consumers and fans. In addition, the affiliation between "Waves" and the raunchy team and the "fucked up family" of owners depicted in the show, and the confusion at least as to whether Pepperdine sponsored, endorsed or licensed the use of its marks for such a show, may hinder Pepperdine's ability to recruit students, athletes, faculty and donors that are reflective of its mission and values. Pepperdine has worked diligently over the last eight decades to uphold its values and build its reputation. As *Running Point* gains more promotion, advertising, and media attention, the false associations with Pepperdine's marks will only grow stronger.

Further, the use of Pepperdine's marks in *Running Point* will prevent Pepperdine from having active control over the narratives associated with its reputation, and leave that control in Defendants' hands. Certainly, the fact that "plaintiff has had the symbol of its reputation placed in the

hands of another is irreparable injury." *Steinway & Sons* v. *Robert Demars & Friends*, 1981 WL 40530, at *8 (C.D. Cal. Jan. 28, 1981) (internal quotations omitted); *see eBay, Inc.* v. *Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1066 (N.D. Cal. 2000).

Additionally, the harm caused by Defendants' release of the series will be exacerbated by the broad marketing channels Defendants use. The trailer was released on various social media platforms and was picked up by a number of blogs and news outlets. But when the series is released, it will be released and promoted to a greater audience—at a minimum, the over 300 million Netflix subscribers whether or not they are active on social media or blogs or news outlets. *See* Company Profile, NETFLIX: INVESTORS, https://ir.netflix.net/ir-overview/profile/default.aspx (last accessed Feb. 19, 2025). Defendants' release of the series will almost assuredly result in disparagement and tarnishment of Pepperdine's carefully built brand and goodwill. *See Gucci Am., Inc.* v. *Los Altos Boots, Inc.*, 2014 WL 12561613, at *7 (C.D. Cal. Aug. 27, 2014) ("'Evidence of a loss of control over business reputation and damage to goodwill' may be sufficient to show irreparable harm.") (cleaned up).

**2. The Balance of Hardship Weighs In Pepperdine's Favor.**

"[C]ourts must balance the competing claims of injury and consider the effect of granting or withholding the requested relief." *Winter*, 555 U.S. at 29. Here, the balance weighs sharply in Pepperdine's favor.

As an initial matter, Defendants are unlikely to suffer any unfair harm or hardship. "[W]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration." *Gucci*, 2014 WL 12561613, at *7 (quoting *Dr. Seuss Enters., L.P.* v. *Penguin Books USA, Inc.*, 924 F. Supp. 1559, 1574 (S.D. Cal. 1996) *aff'd,* 109 F.3d 1394 (9th Cir. 1997)). Plainly, "any injury that Defendants may suffer as a result of the preliminary injunction may be discounted by the fact that Defendants brought the injury upon themselves by intentionally adopting a deceptively similar trademark to Plaintiff's." *Kreation Juicery, Inc.* v. *Shekarchi*, 2014 WL 7564679, at *12 (C.D. Cal. Sept. 17, 2014) (internal quotations omitted). Indeed, as Defendants have no legitimate interest in infringing Pepperdine's marks, any "harm" resulting to them from a TRO, including economic harm, should be discounted. *See, e.g.*, *U.S. Olympic Comm.* v. *Xclusive Leisure & Hosp. Ltd.*, 2008 WL 3971120, at *10 (N.D. Cal. Aug. 25,

2008) ("Where the intent to infringe is clear, even if the defendant's entire business was built upon the infringing mark, the balance of hardships weighs in favor of the plaintiff.").

Furthermore, a delay here would cause no actual harm to Defendants. Netflix is a company that operates primarily as a subscription-based streaming platform, and its revenue has already been accounted for by its existing subscriber base—a base not likely to be affected by the delayed release of *Running Point*, one of the many shows in its arsenal. And of course, given that they have no prior or established connection to the use of the WAVES marks, Defendants can always change the name of the team in the series through editing to avoid association with the Pepperdine Waves.

Conversely, if no TRO or preliminary injunction is issued, Pepperdine will suffer significant and irreparable harm, as described above. Once the show is out and online, and once it is viewed by the public, the harm caused by the unwanted association of Pepperdine's brand and image with the team depicted in the show will be irreversible.

The balance of hardships, and the preservation of the status quo, strongly favor immediate injunctive relief.

**3. An Injunction Would Serve The Public's Interest.**

Public policy also favors an injunction when there is a likelihood of confusion, as there is here. *See Playboy Enters., Inc.* v. *Baccarat Clothing Co*., 692 F.2d 1272, 1275 (9th Cir. 1982) ("In addition to the harm caused the trademark owner, the consuming public is equally injured by an inadequate judicial response to trademark infringement."). The Ninth Circuit has determined that "it is essential that the trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement." *Id.* Additionally, the public has an interest in "not being confus[ed] by [] infringing products." *Phillip Morris USA Inc.* v. *Shalabi*, 352 F. Supp. 2d 1067, 1075 (C.D. Cal. 2004). "Preliminary injunctive relief is appropriate here . . . to promote the public interest in protecting trademarks generally as well." *Brookfield Comms.* v. *W. Coast Entm't Corp.*, 174 F.3d 1036, 1066 (9th Cir. 1999).

There is also a public interest in protecting universities and their intellectual property. As institutions, universities expend huge efforts and resources over many years and decades to build up their identities and maintain their reputations with the public. Once harmed, they are difficult to rebuild. The public in general, and Los Angeles in particular, benefit from having strong institutions of higher learning

in their midst that can attract students, faculty and athletes that align with their mission and values. The public would be harmed if Pepperdine's reputation is harmed.

**4. No Bond Should be Required.**

Under Fed. R. Civ. P. 65(c), a preliminary injunction must be accompanied by a bond "in such a sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." But Rule 65(c) "invests the district court with discretion as to the amount of security required, *if any*." *Tari Labs, LLC* v. *Lightning Labs, Inc.*, 2023 WL 2480739, at *12 (quoting *Johnson* v. *Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)); *see Jorgensen* v. *Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (The Court "may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining [its] conduct."). Here, where the evidence of infringement is so strong, where the Plaintiff is a non-profit educational institution, and where a temporary restraining order will not result in any legally cognizable harm to Defendants but will help prevent further irreparable harm to Pepperdine, and is solidly in the public interest, the Court should not require a bond.

## V. CONCLUSION

For the foregoing reasons, Pepperdine respectfully asks this Court to grant its motion for a temporary restraining order.

Dated: February 20, 2025

*/s/Andrei Iancu*
Andrei Iancu (SBN 184973)
iancua@sullcrom.com
Robert A. Sacks (SBN 150146)
sacksr@sullcrom.com
Emily Olsen (SBN 353281)
olsene@sullcrom.com
**SULLIVAN & CROMWELL LLP**
1888 Century Park East
Los Angeles, California 90067
Telephone: (310) 712-6600
Facsimile: (310) 712-8800

Aviv S. Halpern (SBN 327100)
halperna@sullcrom.com
**SULLIVAN & CROMWELL LLP**
550 Hamilton Avenue
Palo Alto, California 94301
Telephone: (650) 461-5600
Facsimile: (650) 461-5700

Daniel M. Cislo (SBN 125378)
dan@cislo.com
Katherine M. Bond (SBN 263020)
kbond@cislo.com
**CISLO & THOMAS LLP**
12100 Wilshire Blvd., Ste. 1700
Los Angeles, CA 90025
Telephone: (310) 979-9190

*Attorneys for Plaintiff Pepperdine University*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Pepperdine University, certifies that this brief contains 6, 873 words, which complies with the word limit of L.R. 11-6.1

Dated: February 20, 2025

*/s/Andrei Iancu*
Andrei Iancu