DANIEL M. PETROCELLI (SBN 97802)
dpetrocelli@omm.com
MATT KLINE (SBN 211640)
mkline@omm.com
AMY R. LUCAS (SBN 264034)
alucas@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067
Tel.: (310) 553-6700
Fax: (310) 246-6779

JAMES D. WEINBERGER *(pro hac vice admission forthcoming)*
jweinberger@fzlz.com
SHELBY P. ROKITO *(pro hac vice admission forthcoming)*
srokito@fzlz.com
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
151 West 42nd Street, 17th Floor
New York, New York 10036
Tel.: (212) 813-5900
Fax: (212) 813-5901

Attorneys for Defendants NETFLIX, INC. and
WARNER BROS. ENTERTAINMENT INC.

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PEPPERDINE UNIVERSITY,<br><br>Plaintiff,<br><br>v.<br><br>NETFLIX, INC. and WARNER BROS. ENTERTAINMENT INC,<br><br>Defendants. | Case No.: 2:25-cv-01429<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Date: February 25, 2025<br>Time: 1:30 pm<br>Courtroom 5D<br><br>The Honorable Cynthia Valenzuela<br><br>Complaint Filed: February 20, 2025 |

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................... 1

II.    FACTUAL BACKGROUND ................................................................... 2

III.   PEPPERDINE'S MOTION SHOULD BE DENIED. ................................. 7

    A.    The Relief Pepperdine Seeks Is Disfavored. ........................................ 8

    B.    Pepperdine Cannot Establish Likelihood of Success on the Merits. .... 8

        1.    Plaintiff's Motion Misstates the Law, Applying an Inapt Test. .. 8

        2.    Pepperdine's Motion Fails Under the Governing *Rogers* Test. 11

        3.    Pepperdine's Claims Also Fail Under Its Own Inapt Tests. ...... 13

    C.    Pepperdine Cannot Establish Irreparable Harm. ................................ 19

    D.    The Equities And Public Interest Strongly Favor Defendants. ........... 21

IV.    A BOND OF $50,000,000 WOULD BE REQUIRED. ............................. 23

V.     CONCLUSION ..................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AMF, Inc. v. Sleekcraft Boats*,
599 F.2d 341 (9th Cir. 1979) ........................................................... 9, 14

*Arenas v. Shed Media U.S. Inc.*,
881 F. Supp. 2d 1181 (C.D. Cal. 2011), aff'd sub nom. 462 F.
App'x 709 (9th Cir. 2011) ............................................................... 23, 24

*Avery Dennison Corp. v. Sumpton*,
189 F.3d 868 (9th Cir. 1999) ................................................................ 21

*Betty's Found. for Elimination of Alzheimer's Disease v. Trinity
Christian Ctr. of Santa Ana, Inc.*,
2021 WL 3046889 (C.D. Cal. Apr. 7, 2021) ......................................... 10

*Brown v. Elec. Arts, Inc.*,
724 F.3d 1235 (9th Cir. 2013) .............................................................. 10

*Chase-Riboud v. Dreamworks, Inc.*,
987 F. Supp. 1222 (C.D. Cal. 1997) ..................................................... 24

*Chavez v. AmeriGas Propane, Inc.*,
2015 WL 12859721 (C.D. Cal. Feb. 11, 2015) ...................................... 13

*Dr. Seuss Enters., L.P. v. ComicMix LLC*,
983 F.3d 443 (9th Cir. 2020) ................................................................ 12

*E.S.S. Ent. 2000, Inc. v. Rock Star Video*,
547 F.3d 1095 (9th Cir. 2008) ......................................................... 10, 13

*Ear Charms, Inc. v. Bling Jewelry, Inc.*,
No. 16-CV-02091-CJC(JCGx), 2017 WL 2957796 (C.D. Cal. Apr.
11, 2017) .............................................................................................. 20

*Fivefold Properties Dunnegan LLC v. Toorak Cap. Partners LLC*,
2024 WL 3009327 (C.D. Cal. May 7, 2024) ...................................... 8, 23

*Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*,
654 F.3d 958 (9th Cir. 2011) ................................................................ 16

*Fortres Grand Corp. v. Warner Bros. Ent. Inc.*,
947 F. Supp. 2d 922 (N.D. Ind. 2013), aff'd, 763 F.3d 696 (7th Cir.
2014) .................................................................................................... 17

*Fortres Grand Corp. v. Warner Bros. Entertainment. Inc.*,
763 F.3d 696 (7th Cir. 2014) ........................................................... 17, 18

*Goldie's Bookstore, Inc. v. Super. Ct. of State of Cal.*,
739 F.2d 466 (9th Cir. 1984) .................................................................. 8

*Gordon v. Drape Creative, Inc.*,
909 F.3d 257 (9th Cir. 2018) ........................................................... 11, 12

*Guthrie Healthcare Sys. v. ContextMedia, Inc.*,
826 F.3d 27 (2d Cir. 2016) ..................................................................... 9

*Haas Automation, Inc. v. Steiner*,
No. 24-CV-03682-AB-JC, 2024 WL 4440914 (C.D. Cal. Sept. 25,
2024) ............................................................................................... 11, 12

*Habitat Educ. Ctr. v. U.S. Forest Serv.*,
    607 F.3d 453 (7th Cir. 2010) ..................................................................25

*In re Cordua Rest, Inc.*,
    823 F.3d 594 (Fed. Cir. 2016) ...............................................................16

*Jack Daniel's Props., Inc. v. VIP Products. LLC*,
    599 U.S. 140 (2023) ...............................................................................10

*Jackson v. Netflix, Inc.*,
    No. 20-CV-06354M-CSG-JS, 2020 WL 8028615 (C.D. Cal. Dec. 9,
    2020) ......................................................................................................12

*Jada Toys, Inc. v. Mattel, Inc.*
    518 F.3d 628 U.S.P.Q.2d 1895 (9th Cir. 2008)......................................21

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009) ...............................................................24

*Kerr Corp. v. Tri Dental, Inc.*,
    2013 WL 990532 (C.D. Cal. Mar. 11, 2013) .........................................14

*Levi Strauss & Co. v. Blue Bell, Inc.*,
    632 F.2d 817 (9th Cir. 1980) .................................................................16

*llusionist Distribution, LLC v. Sony Pictures Classics, Inc., et al.*,
    No. 10-CV-08062-DMG, (MANx) (C.D. Cal. Nov. 4, 2010) ............23, 24

*M2 Software, Inc. v. M2 Commc'ns, LLC*,
    281 F. Supp. 2d 1166 (C.D. Cal. 2003)..................................................14

*Mattel Inc. v. MCA Records*,
    296 F.3d 894 (9th Cir. 2002) ..............................................................9, 11

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ..................................................................................8

*McGillvary v. Netflix, Inc.*,
    2024 WL 3588043 (C.D. Cal. July 30, 2024) .....................................10, 11

*Morton v. Twitter, Inc.*,
    No. 20-CV-10434-GW-JEMX, 2021 WL 6618889 (C.D. Cal. Oct.
    21, 2021) ...................................................................................................8

*Munaf v. Geren*,
    553 U.S. 674 (2008) ..................................................................................8

*Norm Thompson Outfitters, Inc. v. Gen. Motors Corp.*,
    448 F.2d 1293 (9th Cir. 1971)................................................................16

*Punchbowl, Inc. v. AJ Press, LLC*,
    90 F.4th 1022 (9th Cir. 2024)................................................................12

*Rogers v. Grimaldi*,
    875 F.2d 994 (2d Cir. 1989) .............................................................9, 11

*Roxbury Ent. v. Penthouse Media Group, Inc.*,
    669 F. Supp. 2d 1170 (C.D. Cal. 2009)..................................................10

*Sammartano v. First Judicial District Court*,
    303 F.3d 959 (9th Cir. 2002)..................................................................24

*Save Our Sonoran, Inc. v. Flowers*,
    408 F.3d 1113 (9th Cir. 2005).................................................................25

*Self-Ins. Inst. of Am., Inc. v. Software & Info. Indus. Ass'n*,
   208 F. Supp. 2d 1058 (C.D. Cal. 2000)...........................................................14, 18

*Stewart Surfboards, Inc v. Disney Book Grp.*, LLC,
   No. CV 10-2982 GAF (SSX), 2011 WL 12877019 (C.D. Cal. May
   11, 2011)..................................................................................................................12

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
   240 F.3d 832 (9th Cir. 2001) ....................................................................................8

*Summit Ice Melt Sys., Inc. v. HotEdge, LLC*,
   No. 24-CV-00066-ART-CSD, 2025 WL 305202 (D. Nev. Jan. 27,
   2025)........................................................................................................................21

*Twentieth Century Fox Television v. Empire Distrib., Inc.*,
   875 F.3d 1192 (9th Cir. 2017) ..................................................................................9

*Vision Wheel, Inc v. Vision Forged*,
   732 F. Supp. 3d 1161 (C.D. Cal. 2024) ....................................................................8

*Wenger S.A. v. Olivet Int'l, Inc.*,
   No. 20-CV-1107 (AS), 2024 WL 36864 (S.D.N.Y. Jan. 3, 2024)....................21

*Whirlpool Corp. v. Marshall*,
   445 U.S. 1 (1980) ...............................................................................................8, 22

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .....................................................................................................8

*WonderKiln, Inc. v. Snap, Inc.*,
   No. 22-CV-03311-RGK (MAR), 2022 WL 18397509 (C.D. Cal.
   Nov. 15, 2022)........................................................................................................20

**Statutes**

15 U.S.C. § 1125(c) ......................................................................................................21

**Other Authorities**

*See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair
   Competition* § 31:144.50 (5th ed. 2025) 2022..............................................10, 20

**MEM. OF P&A IN OPP. TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

## I.   INTRODUCTION

Pepperdine University's request for a TRO and preliminary injunction three days before the release of *Running Point*, a much-anticipated new TV series, should be denied.  Among many defects, the motion seeking highly disfavored relief:

- Invites the Court to apply the wrong trademark law test, when Pepperdine plainly fails the correct one;
- Ignores the millions of dollars of harm such an injunction would cause;
- Takes no account of Pepperdine's obvious lack of diligence;
- And is premised on, at best, speculative harms.

This case involves the use of a fictional pro basketball team, the Los Angeles Waves, in a TV series.  For decades, it has been settled law that challenges to the use of trademarks in First Amendment-protected works like *Running Point* are governed by the *Rogers* test—which balances the rights of free expression, against intellectual property concerns.  Yet neither *Rogers*, Ninth Circuit case law applying it, nor Supreme Court caselaw affirming it, appears in Pepperdine's brief.

The *Rogers* test puts the burden on Pepperdine to show that (1) *Running Point*'s use of "Waves" has no artistic relevance; and (2) is explicitly misleading about Pepperdine as the source, sponsor, or subject of the show.  Pepperdine cannot so prove and thus its motion (and case) fail.  *Running Point*'s use of the "Waves" as a fictional pro basketball team in Los Angeles meets the exceptionally low threshold for artistic relevance—among other things, it evokes the LA region.  And the use of "Waves" in the show is not misleading, and certainly not *explicitly so*.  The series has nothing to do with universities or college sports, and never mentions or alludes to Pepperdine.  If that were not enough, the series has an express disclaimer that it is fiction and has no relation to any real institutions.

In short, the Court need go no further than *Rogers* to deny the motion.  Because it fails *Rogers*, Pepperdine cannot meet the required element of injunctions of likely success on the merits.  Thus, its requests for such relief are fatally flawed.

1      While inapplicable, Pepperdine's claims also fail under its asserted test.

2   Totally absent from Pepperdine's papers are the hallmarks of a legitimate *Sleekcraft*

3   claim; there is no expert survey or any showing of confusion or secondary meaning.

4   And Pepperdine's WAVES marks are weak.  Its *own newspaper* bemoaned how

5   Pepperdine's inconsistent use of marks confused its *own* students and staff about

6   what symbolizes their school: a "P," a "wave," or something else.

7      The equities do not favor Pepperdine either.  As shown by Defendants in their

8   declarations, either delaying, digitally re-editing, or reshooting the *Running Point*

9   series would cost them millions and directly harm the cast and crew.  Moreover,

10  Pepperdine fails to justify its long delay in raising claims and filing this motion.

11     Pepperdine's motion should be denied.  No OSC should issue.  And a

12  schedule should be set for Defendants' motion to dismiss.

13  **II.    FACTUAL BACKGROUND**

14     a.  The Series.  *Running Point* is a comedy created, written, and produced by

15  award-winning actress, writer, director, and producer Mindy Kaling.  Among other

16  accolades, Kaling was the first woman of color to create, helm, and star in a

17  successful sitcom on a major network.  With the life story of Jeanie Buss (daughter

18  of Lakers' owner Jerry Buss) in mind, *Running Point* was pitched to Warner Bros.

19  in 2020, and the show went into production in 2024.  (Decl. of Brett Paul ¶¶ 2-3.)

20     *Running Point* tells the story of Isla Gordon, a woman who takes the helm of

21  a fictional pro basketball team called the "Los Angeles Waves," once owned by her

22  father, and which after decades of winning championships is in crisis.  (*Id*. ¶ 4.)

23  When her older brother steps down as president, Ms. Gordon, played by Kate

24  Hudson, is abruptly promoted.  This after years of Ms. Gordon being overlooked by

25  her father—despite her abiding love for and knowledge of basketball.  In a male-

26  dominated industry, this puts her suddenly in charge of one of the most famous

27  sports franchises in the world.  (*Id*.)  Ms. Buss, who had a similar rise, helped

28  conceptualize the show and is an executive producer.  (*Id*.)

"Waves" is the name of the fictional pro team in *Running Point*—a nod to the real-life Lakers, whose team name references water (lakes in Minneapolis where the team began). (Paul Decl. ¶ 5.) The Waves name evokes the LA area in which the fictional team plays. (*Id*. ¶ 6.)[1] In naming the "LA Waves," the creators did not believe it would cause confusion, as there is no major pro sports team with the name. (*Id*.) "Waves" names are common among non-professional sports teams, especially in Southern California. (*Id*. ¶ 6; Decl. of Amy R. Lucas ¶ 8 & Ex. F.)

Nor is the use of the colors blue and orange for the fictional "Los Angeles Waves" based on Pepperdine's colors. The creators chose orange because it is the color of a basketball and light blue because that is the color of ocean waves. (Paul Decl. ¶ 7.) The combination of blue and orange is incredibly common throughout elite, professional, and amateur sports. (Lucas Decl. ¶ 7 & Ex. E.)[2]

In any event, as one can see from Pepperdine's own brief, the colors in the show and on the few jerseys it cites as its own are not direct matches of one another. Any similarities in design owe to those typical of sports jerseys the world over: large bold lettering, mixing in obvious references like a ball or mascot.

There is no trademark use of the "Waves" name in *Running Point*. The term is not used for any commercial purpose or to identify any particular source of goods. Rather, it is used as the name of the fictional team in the show. (Paul Decl. ¶ 9.) Nor was the name chosen to comment on Pepperdine or the religious values it cites in its briefing. (*Id*.) The series never reference Pepperdine. (*Id*. ¶ 11.)

Even if the Pepperdine Waves were a strong international, national, or even regional brand (and it is none of those), it would make no creative or narrative sense

---

[1] Pro basketball teams are often named after local features (*e.g*., "Heat": Miami climate; "Rockets": Houston/NASA; "Knicks": "Knickerbockers" who settled in New York City; "76ers": Declaration of Independence).

[2] This includes the New York Knicks and Oklahoma City Thunder in the NBA. In college: the Cal State Fullerton Titans, Florida Gators, Auburn Tigers, University of Illinois Fighting Illini, Boise State Broncos, and University of Virginia Cavaliers. In the NFL, the Denver Broncos and Chicago Bears. In Major League Baseball, the New York Mets. (Lucas Decl. ¶ 7 & Ex. E.)

for the show's creators to draw connections to Pepperdine. *Running Point* is about a woman thrown into reviving a fictional professional sports dynasty that her family stewarded. (Paul Decl. ¶ 4.) It explores topics like sexism, politics of professional basketball and corporate America, income and racial inequality, and blended families. (*Id.* ¶ 10.) The show references other fictional teams and various areas of the city, including Downtown, Santa Monica, Echo Park, and Boyle Heights. (*Id.*)

*Running Point* is very much ***not*** about an elite, private college in Malibu, its Christian values, or its sports team. Indeed, if one reviews the trailer for *Running Point* or the whole series (and we urge the Court to do so, and can provide means to do so *in camera*), one can see it makes no references to Pepperdine or real or fictional colleges. (Paul Decl. ¶ 11.) To prevent any confusion with real events or organizations, *Running Point* states plainly *it is a work of fiction.* (*Id.* ¶ 12.)

b. Business Considerations. Ms. Kaling and Warner's TV division created *Running Point* for distribution on Netflix. (*Id.* ¶ 2.) Netflix paid Warner millions of dollars per episode to produce the show, and 10 episodes are ready to stream. (*Id.* ¶ 13.) Warner entered into product placement deals with featured brands, all of which expect to see the series stream with their brands displayed. (*Id.*) Some 200-plus cast and crew work on the show. (*Id.*)

Marketing spends have been ongoing and significant, with Netflix spending millions to promote the series over the past year and to tout its February 27, 2025, release. (Decl. of Tracey Pakosta ¶ 5.) As a result of these efforts, Netflix's subscribers are expecting to watch *Running Point* this week. (*Id.* ¶ 8.) Netflix puts considerable thought and effort into the scheduled release of its content, ensuring a steady flow of new series and films in a variety of styles and genres. (*Id.* ¶ 3.) If its releases are disrupted, it could suffer reputational harm. (*Id.* ¶ 8.)

Shooting new scenes to eliminate all references to the fictional Waves team name would require Warner to reshoot all 10 episodes, which would take close to a year, cost millions of dollars, and involve a logistical nightmare trying to reassemble

the cast. (Paul Decl. ¶ 15.) A digital fix (obscuring or renaming the team name throughout) would take months, cost millions of dollars, and possibly ruin the visual integrity of the series. (*Id*.) An injunction would harm the cast and writers, as work they performed would be kept from the public. (*Id*. ¶ 16.)

c. Public Knowledge of the Series. Use of the "Los Angeles Waves" as the team in the series was hardly a secret. It was announced ***over a year ago***, in January 2024, that the fictional pro team would be called the "Los Angeles Waves." By May 2024, stories included images of the Waves jersey. (Lucas Decl. ¶¶ 2, 4 & Exs. A, C; Paul Decl. ¶ 14); *infra* Section III.D.

Pepperdine claims it first became aware of the use of the Waves name in the series in January 2025. (Dkt.-2 ("Mot.") at 5.) Given the advance publicity that began months ago (Lucas Decl. ¶¶ 2, 4 & Exs. A, C; Paul Decl. ¶ 14), that claim is dubious. Indeed, as early as January 26, *2024*, media outlets reported Ms. Kaling and Netflix were launching TV show about the "*Los Angeles Waves*":

> Hudson is set to star in a comedy series inspired by Los Angeles Lakers president Jeanie Buss…. Hudson will play Isla Gordon, the only sister in a family of competitive brothers. Isla has been underappreciated her whole life, but when a scandal forces her brother to resign as president of the ***Los Angeles Waves*** pro basketball team, she's appointed president and gets the chance to prove she deserves to be part of the family business.

(Lucas Decl. ¶ 2 & Ex. A.) Any diligent policing of Pepperdine's marks (let alone Google alerts) would call up hits to these "Waves" references.

Upon receiving Pepperdine's inquiries last month, Defendants worked to respond. (Dkt.-1 Ex. H.) Had Pepperdine truly been worried that its brand was being irreparably harmed, it could have sought relief immediately. It did not do so. Rather, Pepperdine waited until days before launch, gave defendants no warning of filing this lawsuit, and then filed a rushed TRO application, along with a splashy press release, (Lucas Decl. ¶14 & Ex. I), which did far more to create an association between Pepperdine and the show than any conduct by Defendants.

1       d.  Pepperdine's Brand.  Last, the Court would not know it from Pepperdine's

2   complaint, motion, or press release, but Pepperdine's marks are not nearly as robust

3   as it touts.  The below comes verbatim from a *Pepperdine University Graphic* article

4   about the branding challenges its athletics program faces:

## Pepperdine Athletics' Branding Faces Bevy of Challenges

June 3, 2019 by Kyle McCabe & Karl Winter

Two senior officials from Pepperdine University's Athletic Department and a group of students were asked to identify the department's primary logo.

The results are mixed.

"I would say 'P' with the 'Waves' under it is our primary logo," Director of Development Tim Cullen said, referring to the first logo shown below.

 

*Three of Pepperdine University's many athletic logos. Photos from ESPN (top) and Pepperdine University (middle and bottom).*

"Pepperdine' with the waves in the back and 'Pepperdine Waves," said Karina Herold, senior associate director of athletics, referring to the second logo. "That's our primary logo."

Forty three Pepperdine students were polled with the same query.

The plurality said it was the third one.

The correct emblem is actually the second one, according to the University's website.

However, ESPN uses the first logo when televising an event featuring a Pepperdine team, and the third logo is arguably the most visible logo on Pepperdine's Malibu campus, on both athletic facilities and apparel.

How could two major figures and an entire group of students all disagree on the primary logo?

When it comes to Pepperdine Athletics' branding confusion and associated complications, the logo is only the tip of the iceberg.

…

**MEM. OF P&A IN OPP. TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



A collage of Pepperdine athletic logos on clothing and signage around the Malibu campus. Photos by Karl Winter, collage by Kyle McCabe.

(Lucas Decl. ¶ 13 & Ex. K.)  Nowhere in its motion does Pepperdine disclose that just a few years ago only 23% of its *own people*—let alone the surely much lower numbers across Los Angeles or the United States—could identify the "Pepperdine Waves" as the school's main emblem.  (*Cf. id.*)  Nor does the motion highlight the various color schemes the college uses or the "confusion" this has caused.  (*Id.*)

## III.    PEPPERDINE'S MOTION SHOULD BE DENIED.

Despite seeking disfavored relief that would severely damage Defendants, Pepperdine's motion does not even cite the proper legal test.  Its failure to address

7

the governing *Rogers* test (which applies to First Amendment-protected works like *Running Point*) is reason alone to deny this motion.  Indeed, the failure to address the test *at all*—either intentionally, or out of confusion—is inexcusable.

### A.    The Relief Pepperdine Seeks Is Disfavored.

A TRO, much like a preliminary injunction, "is an *extraordinary and drastic remedy*, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (all emphases added throughout, unless noted); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  *Morton v. Twitter, Inc.*, No. 20-CV-10434-GW-JEMX, 2021 WL 6618889, at *1 (C.D. Cal. Oct. 21, 2021) (TROs involve "the invocation of a *drastic remedy* which a court of equity *ordinarily does not grant*").

To obtain such relief, plaintiff must adduce "substantial proof" supporting the application.  *Mazurek*, 520 U.S. at 972.  Plaintiff must show: "(1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest." *Vision Wheel, Inc v. Vision Forged*, 732 F. Supp. 3d 1161, 1165 (C.D. Cal. 2024); *see Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n.7 (9th Cir. 2001) (standards for preliminary injunction and TRO are the same).  "Speculative injury does not constitute irreparable injury." *Goldie's Bookstore, Inc. v. Super. Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984). Moreover, because this relief is designed for use in only "emergency situations," *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 20 n.33 (1980), any delay in seeking such emergency relief weighs against granting it, *see Fivefold Props. Dunnegan LLC v. Toorak Cap. Partners LLC*, 2024 WL 3009327, at *2 (C.D. Cal. May 7, 2024).

### B.    Pepperdine Cannot Establish Likelihood of Success on the Merits.

#### 1.    Plaintiff's Motion Misstates the Law, Applying an Inapt Test.

Trademark law focuses on protecting consumers from confusion. *E.g.*, *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 50 (2d Cir. 2016)

1    ("trademark law … protects against confusion").  Pepperdine cites the traditional

2    eight-part "*Sleekcraft*" test, *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49

3    (9th Cir. 1979), claiming it is the operative legal test on this motion, Mot. 14.  But

4    that test applies to general commerce (not expressive works), where a product is

5    sold using a mark similar to that of a well-known competitor.

6        Because *Running Point* is an expressive work with strong First Amendment

7    protection, courts instead use the landmark test announced in *Rogers v. Grimaldi*,

8    875 F.2d 994, 999 (2d Cir. 1989).  *Rogers* noted the tension between free-speech

9    rights and trademark claims and held that "the [Lanham] Act should be construed to

10   apply to *artistic works only where the public interest in avoiding consumer*

11   *confusion outweighs the public interest in free expression*."

12       Under *Rogers* and its four decades of progeny, where an allegedly infringing

13   trademark is used within the context of an expressive work, the use of a mark is *fully*

14   *protected* by the First Amendment—and the plaintiff has no recourse under the

15   Lanham Act—provided that (a) the mark has *artistic relevance* to the defendant's

16   underlying expressive work; and (b) the use does not *explicitly mislead* as to the

17   source or content of the underlying work.  *Id*. at 1000.

18       *Rogers* has long been applied in the Ninth Circuit, including to defeat claims

19   targeting TV series, films, songs, and videogames.  *E.g.*, *Twentieth Century Fox*

20   *Television v. Empire Distrib., Inc.*, 875 F.3d 1192, 1195-97 (9th Cir. 2017)

21   (applying *Rogers*; use of name "Empire" as TV series title, depicting fictional hip

22   hop music label "Empire Enterprises," protected by First Amendment); *Mattel Inc.*

23   *v. MCA Records*, 296 F.3d 894, 902 (9th Cir. 2002) (same; use of "Barbie" in song

24   "Barbie Girl" did not infringe Mattel's trademark); *E.S.S. Ent. 2000, Inc. v. Rock*

25   *Star Video*, 547 F.3d 1095, 1099-1100 (9th Cir. 2008) (same; inclusion of strip

26   club's logo in videogame was not explicitly misleading and protected by First

27   Amendment); *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1245-46 (9th Cir. 2013)

28   (same; use of former NFL player's likeness in videogame did not violate Lanham

9

Act); *McGillvary v. Netflix, Inc.*, 2024 WL 3588043, at *13 (C.D. Cal. July 30, 2024) (same; use of public figure's name in Netflix documentary did not violate Act); *Roxbury Ent. v. Penthouse Media Group, Inc.*, 669 F. Supp. 2d 1170, 1175–76 (C.D. Cal. 2009) (same; pornographic film called *Route 66* did not infringe *Route 66* show); *Betty's Found. for Elimination of Alzheimer's Disease v. Trinity Christian Ctr. of Santa Ana, Inc.*, 2021 WL 3046889, at *2-3 (C.D. Cal. Apr. 7, 2021) (same; TV show's use of the title "Remember the Music" proper, even though foundation owned a registered trademark in "Remember the Music").

Indeed, it is hornbook trademark law that the *Rogers* test applies to TV shows like *Running Point*. *See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:144.50 (5th ed. 2025) ("The *Rogers* test is used if the mark is used in an 'expressive' context[,]" including "a television series").

Read most charitably, perhaps Pepperdine believes that *Jack Daniel's Props., Inc. v. VIP Products. LLC*, 599 U.S. 140 (2023), which declined to apply *Rogers* in a dog-toy case, somehow silently overruled 40 years of First Amendment caselaw. But any such argument is in error. The Supreme Court left untouched the use of *Rogers* in cases involving expressive works—distinguishing an instance where a company intentionally created a toy product using the household-name Jack Daniel's to sell toys based on the association. In so holding, the Court ruled that the *Rogers* test continues to apply in "cases involving 'non-trademark uses,'" or where the defendant "has used the mark at issue in a non-source-identifying way," *id.* at 155-56, *e.g.*, as the name of a fictional sports team or record label in a TV show.

Post-*Jack Daniel's* caselaw confirms this. *E.g.*, *McGillvary*, 2024 WL 3588043, at *13 ("*Jack Daniel's* simply added the non-source-identifying threshold requirement to the *Rogers* test, and 'preexisting Ninth Circuit precedent adopting and applying *Rogers* otherwise remains intact and binding.'"); *Haas Automation, Inc. v. Steiner*, No. 24-CV-03682-AB-JC, 2024 WL 4440914, at *6 (C.D. Cal. Sept. 25, 2024) (applying *Rogers* to dismiss Lanham Act claim arising out of defendant's

10

use of plaintiff's HAAS trademarks, including on the *covers* of defendant's book; the book was an expressive work, the use was relevant to the story, and there was no "explicitly misleading statement or suggestion by way of the Haas Marks").

For Pepperdine not to cite or grapple with the *Rogers* test borders on the sanctionable, especially given the emergency it has created with this rushed motion. All Pepperdine cites is the *Jack Daniel's* case on remand to the Arizona district court and it does nothing to address the First Amendment issues its motion presents.

In short, *Rogers*—not *Sleekcraft*—governs this case. Pepperdine has not met and cannot meet the *Rogers* two-part test, as shown below.

### 2. Pepperdine's Motion Fails Under the Governing *Rogers* Test.

### a. The Use of "Waves" Is Artistically Relevant.

Under the first prong of *Rogers*, the test for artistic relevance is purposely low and is met unless the use has "no artistic relevance to the underlying work whatsoever." *Matte*, 296 F.3d at 902; *Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 268 (9th Cir. 2018) ("[T]he level of artistic relevance under *Rogers*'s first prong need only exceed zero…."). Here, "Waves" in the name of a fictional "Los Angeles Waves" pro team in *Running Point* easily meets the test. The name plainly evokes the Lakers and Ms. Buss's life, LA's renowned beach culture, and the ups-and-downs of the protagonist.

Courts have long noted that artistic relevance may be found on numerous grounds, including the "geographic setting of the work." *Jackson v. Netflix, Inc.*, No. 20-CV-06354M-CSG-JS, 2020 WL 8028615 (C.D. Cal. Dec. 9, 2020); *see Stewart Surfboards, Inc v. Disney Book Grp*., LLC, No. CV 10-2982 GAF (SSX), 2011 WL 12877019, at *5 (C.D. Cal. May 11, 2011) (dismissing Lanham Act claim; finding use of plaintiff's STEWART SURFBOARDS mark on cover of Disney's *Hannah Montana* book artistically relevant since the book's plot involved a surfing competition and use of plaintiff's mark "evoke[d] the surfing theme").

There are ample connections in *Running Point* between the "Waves" name, the show's plot, and the show's setting such that the artistic relevance clearly "exceed[s] zero" and the low bar to pass *Rogers*' first prong.  *Gordon*, 909 F.3d at 268.  That so many Southern California teams have adopted the name "Waves" further indicates the artistic relevance to this geographic area.  *Infra* at 13-14.

### b.    The Use of "Waves" Is Not Explicitly Misleading.

Nor can Pepperdine meet *Rogers*' second prong, which requires showing that the challenged use is "explicitly misleading"—*i.e.*, "there must be an *explicit indication, overt claim, or explicit misstatement* about the source of the work." *Haas Automation*, 2024 WL 4440914, at *6.  Proving that the use is "explicitly misleading" is a "high bar" and even an indication that the work implicitly suggests endorsement or sponsorship is not sufficient to meet the high standard.  *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 462 (9th Cir. 2020) (defendant's book was not explicitly misleading as to source despite fact it used "Seussian font in the cover, the Seussian style of illustrations, and even a title that adds just one word— Boldly—to the famous title—Oh, the Places You'll Go!").

Here, neither the Complaint nor Pepperdine's motion even allege that *Running Point* makes any specific reference to Pepperdine.  To the contrary, the series has nothing to do with Pepperdine as a subject matter, and the series' credits and title cards show that it comes from Warner, Netflix, and Ms. Kaling.  No use of "Waves" in the series comes anywhere close to an "explicitly misleading" one, as cases like *Dr. Seuss* show.  And Defendants have not created or marketed the series in any way to create an express or implied juxtaposition between Pepperdine's school values and the show's themes about a female executive, rebuilding a pro sports franchise, and trying to make it in a hard-charging family and industry.

Thus, Pepperdine's claims in this case are plainly infirm under *Rogers*, and this is yet another instance where free-speech rights, which benefit all, must

**MEM. OF P&A IN OPP. TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

1    overcome the provincial interests Pepperdine advances.  Indeed, the Court's

2    application of the *Rogers* test should be the beginning and the end of this case.[3]

3            **3.        Pepperdine's Claims Also Fail Under Its Own Inapt Tests.**

4            Pepperdine says its motion hinges solely on its claims for trademark

5    infringement and false designation of origin, Mot. 12-13, saving for later its claims

6    for dilution, false advertising, and unfair business practices, *id.* n.3.  It also says its

7    motion hinges only on its three black-and-white registered wave marks, and not

8    common-law claims it might assert.  (*Id.*)  But then Pepperdine mixes and matches

9    all of its claims in argument, talking about its assertedly "famous" marks and

10   "tarnished" image (more relevant to a dilution claim) and common-law claims.  (*Id.*

11   at 15 (alleging that similarities include the "same color palette" and the "same '37'

12   Jersey").)  In any event, *all* of Pepperdine's claims are governed by the *Rogers* test,

13   which Pepperdine fails.  *See E.S.S. Entm't 2000, Inc. v. Rock Star Videos*, Inc., 547

14   F.3d 1095, 1101 (9th Cir. 2008); *Kerr Corp. v. Tri Dental, Inc.*, 2013 WL 990532,

15   at *4 (C.D. Cal. Mar. 11, 2013) (dilution claims "are subject to the same analysis as

16   the federal Lanham Act claims").

17           Although the Court should not even consider these inapplicable tests,

18   Pepperdine fails them, too.  Pepperdine does not and cannot claim that Defendants

19   copied and used one of their three registered black-and-white marks that appear at

20   page 4 of its Motion.  Instead, it alleges that the team name and jerseys used in

21   *Running Point* are similar enough to cause confusion.  But to prevail under the

22   *Sleekcraft* test Pepperdine advances, it must show that "the allegedly infringing

23   conduct carries with it a *likelihood of confounding an appreciable number of*

24   *reasonably prudent purchasers exercising ordinary care*."  *Self-Ins. Inst. of Am.,*

25   *Inc. v. Software & Info. Indus. Ass'n*, 208 F. Supp. 2d 1058, 1070 (C.D. Cal. 2000).

26

27           [3] Pepperdine cannot now be heard to proffer new evidence or argument on this point.
     Having failed properly to press or preserve it, the issue is waived.  *E.g.*, *Chavez v.*
28   *AmeriGas Propane, Inc.*, 2015 WL 12859721, at *4 (C.D. Cal. Feb. 11, 2015) (declining
     to consider new evidence and arguments raised for the first time in reply).

This confusion must be "*probable*," not simply "possible." *M2 Software, Inc. v. M2 Commc'ns, LLC*, 281 F. Supp. 2d 1166, 1173 (C.D. Cal. 2003). Courts consider a list of factors to assess "likelihood of confusion": (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels; (6) the type of goods offered and the degree of care likely to be exercised by purchasers; (7) defendant's intent; and (8) likelihood of expansion. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979).

What is most stark about Pepperdine's motion is the failure to introduce expert evidence to demonstrate any of the factors above or to grapple in any meaningful way with the obvious, public evidence that undercuts its claims.

Factor 1 (Strength of Mark). To see the lack of merit to Pepperdine's claims, one can start with the *Pepperdine University Graphic* article detailing how weak its marks are and how its own people had difficulty identifying Pepperdine's logo. Respondents did not believe the school's main logo was the "Wave" that Pepperdine now touts, but a stylized "P." *Supra* 6-7. As the *Graphic* stated: "When it comes to Pepperdine Athletics' branding confusion and associated complications, *the logo is only the tip of the iceberg*." *Id.*

The Waves mark is weak beyond Pepperdine's campus borders, too, because hundreds of waves-related marks exist, (Lucas Decl. ¶ 12 & Ex. J), and scores of sports teams use waves names, including in Southern California (*id*. ¶ 8 & Ex. F):





California Wave Hockey Club                    Los Angeles Waves Cricket Club

**MEM. OF P&A IN OPP. TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**



Blue Wave Baseball                              South OC Wave Flag Football Club

(Compl. Ex. H (noting "the team name 'Waves' is used fairly widely in the non-professional sports arena … including the Long Beach Blue Waves, San Diego Waves Basketball Clubs and AAU Waves")).

The Court will note the color schemes used above, too.  Waves are blue in real life, so the idea of a blue wave is common.  The Court will also see orange, yellow, and red used as contrast colors, which makes sense.  Not only do these hues evoke the colors of baseball stitches, a basketball, or a California sunset, but blue and orange are at opposite ends of the color wheel and complement one another.

Pepperdine's strength-of-mark argument fails for an additional reason.  It misleads the Court in citing its three registered black-and-white marks, arguing it need not prove secondary meaning (Mot. 13), but then throughout its brief, cites non-registered features of its branding, including the number 37 and the Malibu locale.  (*Id.* at 15, 17-18).  Proving that these non-registered elements or their combination with other marks deserves protection requires Pepperdine first to prove that its common-law uses merit protection.  *See Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958, 966-67 (9th Cir. 2011).  Unregistered uses are *not* entitled a presumption of validity, *id.*, and Pepperdine cannot rely on registered marks to show a protectable interest in unregistered uses of the word "wave," *In re Cordua Rest, Inc.*, 823 F.3d 594, 600 (Fed. Cir. 2016).

In the absence of registration, secondary meaning must be proven by evidence that a substantial part of the consumer class use the designation to identify a single

source. *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 820 (9th Cir. 1980) ("[T]he basic element of secondary meaning is … the mental association by a substantial segment of consumers and potential consumers … 'between the alleged mark and a single source of the product'"); *Norm Thompson Outfitters, Inc. v. Gen. Motors Corp.*, 448 F.2d 1293, 1297 (9th Cir. 1971) (secondary meaning is *not* proven if only a "sparseness of people" associate the mark with plaintiff).

Pepperdine admits in a footnote that, "for the purpose of this motion, [it] does not address the infringement of" its "common law trademark rights in the 'Waves' name, its school colors, and combinations of its school colors with indicia associated with the university." (Mot. 13 n.3). Yet throughout the body of its brief, it argues repeatedly that *Running Point* somehow stole its colors, the number 37, the locale of Malibu, combined with the word "Wave." (*E.g.*, *id.* at 15). In yet another way, Pepperdine's Motion is an analytic mess and misleads the Court on what law applies or how its trademark claim must be proven.[4]

<u>Factors 2, 5, and 6 (Proximity of Goods, Marketing Channels, Type of Goods and Care of Consumers)</u>. Pepperdine also offers no expert testimony (because no credible expert would say so) that the *Running Point* series and Pepperdine and its sports teams vie for the same consumers or compete in similar marketing channels where confusion is likely. Much more could be said about all of these factors, but for now discussion of a recent case involving Batman is illustrative. In *Fortres Grand Corp. v. Warner Bros. Entertainment. Inc.*, 763 F.3d 696, 698 (7th Cir. 2014), plaintiff sold a software product under the trademark CLEAN SLATE. Warner's Batman film *The Dark Knight* included a plot element where "clean slate"

---

[4] Pepperdine's numerical claim is also baseless. Snatching a screen shot from the series' trailer, it argues that a framed jersey in a fictional conference room looks like "the '37' jersey [its] mascot wears." (Mot. 8). Pepperdine offers no evidence that it holds a registered mark "37." Even if "37" were protectable, Pepperdine offers no proof how the "37" jersey could cause confusion. It is one of *eight* framed jerseys shown briefly in the background—*all of which were chosen at random after excluding numbers tied to current or very prominent Lakers players*. Paul Decl. ¶ 8.

**MEM. OF P&A IN OPP. TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

was used to identify a software program.  *Id*.  Plaintiff sued, alleging that Warner's use of "clean slate" would cause consumers to be confused about the source of both the film and plaintiff's software product.  *Id*.  The district court held that plaintiff failed to establish a likelihood of confusion, and that even if there were a potential for consumer confusion, Warner's use of the phrase "clean slate" was protected by the First Amendment under *Rogers*.  *Id*.; *Fortres Grand Corp. v. Warner Bros. Ent. Inc.*, 947 F. Supp. 2d 922, 931 (N.D. Ind. 2013), *aff'd*, 763 F.3d 696 (7th Cir. 2014).

On appeal, the Seventh Circuit affirmed, reaching only the likelihood-of-confusion question.  *Fortres Grand*, 763 F.3d at 698.  It held that plaintiff could not establish confusion about "the source of a utilitarian desktop management software based solely on the use of a mark in a movie and two advertising websites."  *Id*. at 703.  Warner did not "sell any movie merchandise similar to [plaintiff's] software which also bears the allegedly infringing mark."  *Id*.  The only products available to compare were plaintiff's software and Warner's movie, which were "quite dissimilar."  *Id*. at 704.  Plaintiff failed to show it was "plausible that a super-hero movie and desktop management software are goods related in the minds of consumers in the sense that a single producer is likely to put out both goods."  *Id*.

Here, the same analysis applies.  Pepperdine is a school that offers private education and collegiate sports and Waves merchandise.  Defendants made and will distribute a TV series, *Running Point*, about a woman who owns a fictional pro team called the "Los Angeles Waves."  These goods are different.

As Pepperdine touts, *Running Point* has scenes where adults drink, take drugs, or pose semi-topless to promote their pro sports team.  No "reasonably prudent purchasers exercising ordinary care" are going to think Pepperdine is the source of *Running Point*.  *Self-Ins. Inst*, 208 F. Supp. 2d at 1070.  The school is not mentioned in the show.  The series' title cards confirm that Ms. Kaling, Warner, and Netflix produced the series.  And there is a plain disclaimer saying the show is fictional.

MEM. OF P&A IN OPP. TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER

Factor 3 (Similarity of the Marks).  While Pepperdine cherry-picks a few of the jerseys it used over the years to suggest the LA Waves jerseys in *Running Point* are similar to its own, *e.g.*, Mot. 1, again, the *Pepperdine University Graphic* tells a different story—as does a comparison of the colors and styles used, *supra* at 7:



Factor 4 (Actual Confusion).  Despite the extensive pre-release marketing of *Running Point* noted in its Motion, Pepperdine cites *no evidence* that any consumer believes that Pepperdine is the source of *Running Point*.  The one social media post it cites expressly notes the difference between Pepperdine and its sports teams and the fictional Waves team of *Running Point*.  (Halpern Decl. Ex. F.)  This is the antithesis of confusion.  *E.g.*, *Glow*, 252 F. Supp. 2d at 999-1000.

Factor 7 (Intent).  While Pepperdine chases conspiracies, citing a home Ms. Kaling allegedly purchased as proof of ill-intent, the reality is that *Running Point*'s creators chose the "Los Angeles Waves" name and color scheme (a) as a nod to Ms. Buss and her Lakers; (b) to reflect the colors of a wave and a basketball; and (c) light (and not dark) blue to avoid looking like NBA teams like the Knicks. (Paul Decl. ¶¶ 5, 7).  The creators had no need or intent to trade off of Pepperdine.

Factor 8 (Likelihood of Expansion).  The fact that both Pepperdine and the defendants use "social media and other online media" is meaningless, (Mot. 17)—as most U.S. businesses do.  There is no "Los Angeles Waves" merchandise for sale, and Pepperdine can point to none.  Any claims about future, hypothetical products are not ripe.

### C.    Pepperdine Cannot Establish Irreparable Harm.

Again, the Court need not reach these additional reasons to deny Pepperdine's motion, but it also fails the other factors it must prove to obtain a TRO or injunction. This includes its burden to establish that it will suffer irreparable harm and that such harm "is likely, not just possible." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

Here, the alleged harm identified by Pepperdine's CMO is wholly speculative.  Based on his review of a short trailer (not the 10-episode series), Pepperdine contends that: (i) *Running Point* contains "apparent messaging and themes" that are "antithetical to those espoused by the university," (ii) viewers will "forever associate" Pepperdine's marks with the series, (iii) the university will "lose value in the eyes of consumers and fans," and (iv) Pepperdine's "ability to recruit students, athletes, faculty and donors" "<u>may</u>" be hindered.  Mot. 19.

This is all conclusory nonsense.  No one other than Pepperdine, and certainly no expert who conducted a study, has said a single consumer is confused.  The one piece of evidence we do have about the brand—internal studies reported in the *Pepperdine University Graphic*—confirm that Pepperdine harmed itself. Pepperdine has made no showing that Netflix viewers have any idea, in any material numbers, that the Pepperdine college sports team is even called the Waves or has a blue-and-orange jersey.  Nor has it shown how Netflix's sophisticated consumers, who pay fees to subscribe, cannot distinguish a downtown LA pro sports team from a small, Christian university in Malibu.  (Pakosta Decl. ¶ 9.)

Circular, self-serving claims of irreparable harm do not come close to justifying the drastic, disfavored, and rare relief of shelving First Amendment-protected works. *Cf., e.g.*, *Ear Charms, Inc. v. Bling Jewelry, Inc.*, No. 16-CV-02091-CJC(JCGx), 2017 WL 2957796, at *6 (C.D. Cal. Apr. 11, 2017) (denying preliminary injunction for lack of proof; "[w]hile loss of goodwill and reputation can in some circumstances constitute irreparable harm, it must be supported by

1   sufficient evidence demonstrating that such loss is *likely*") (emphasis in original)).

2       Having no real evidence of injury, Pepperdine invokes a presumption of

3   irreparable harm provided in Lanham Act, 15 U.S.C. § 1116(a).  But that provision

4   applies only "upon a finding of likelihood of success on the merits…."  Pepperdine

5   has not shown a likelihood of success on any claim, as shown above; thus no

6   presumption is triggered.  *See WonderKiln, Inc. v. Snap,¶ Inc.*, No. 22-CV-03311-

7   RGK (MAR), 2022 WL 18397509, at *3 (C.D. Cal. Nov. 15, 2022) ("Plaintiff has

8   failed to demonstrate a likelihood of success on the merits, instead raising only

9   serious questions.  The Court therefore declines to apply this presumption.").

10  Pepperdine's attempts to invoke this provision misleads as well, as it mixes

11  common-law claims with its few registered marks.  In any event, even were a

12  presumption appropriate here, it has been thoroughly rebutted.

13      Pepperdine lastly makes sweeping claims—unsupported by evidence—that its

14  marks are "famous," Mot. 3, 4, alleging *Running Point* will "dilute[e] the value" of

15  its marks "and tarnish[] the reputation and goodwill associated with Pepperdine's

16  brand."  *Id.* at 3; *id.* at 1, 2, 10.  Yet, Pepperdine admits it is not pressing its dilution

17  claim on this motion.  *Id.* 13 n.2.  Of course, that is because the likelihood of success

18  on such a claim is beyond remote.[5]

19

20

21

22

23      [5] Trademark dilution is "reserved for a select class of marks—those marks with such

24  powerful consumer associations that even non-competing uses can impinge on their value."  *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999).  A mark is

25  famous only if it is "***immediately familiar to very nearly everyone, everywhere in the nation***."  McCarthy, *supra*, § 24:104.  The mark must be famous standing on its own—*i.e.*,

26  independent of the name "Pepperdine" or any other logos, colors, or numbers.  *See* 15 U.S.C. § 1125(c); *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634, 885 U.S.P.Q.2d 1895

27  (9th Cir. 2008).  Marks like "Coca-Cola, Nike, Budweiser" are "heartland examples of famous marks."  *Wenger S.A. v. Olivet Int'l, Inc.*, No. 20-CV-1107 (AS), 2024 WL 36864,

28  at *3 (S.D.N.Y. Jan. 3, 2024).  Pepperdine's WAVES mark comes nowhere close.

**D.    The Equities And Public Interest Strongly Favor Defendants.**

Defendants touted *Running Point*, and the team name it would use in the show—the ***Los Angeles Waves***—starting in January 2024.  *Supra* at 5.  By May 2024, media outlets like *Variety* featured images of the Los Angeles Waves jerseys.



That May 2024 *Variety* article (which quotes a synopsis of the series and includes stills) explained that *Running Point* featured a pro sports team called the "Los Angeles Waves" plagued by "scandal."  (Lucas Decl. Ex. C (including other May 2024 articles about *Running Point* that contain images of the LA Waves jerseys)).

Whether out of lack of diligence in policing its WAVES mark or otherwise, Pepperdine allegedly only first saw the trailer in January 2025, then waited a month to bring this injunction motion seeking to shelve the show.  During all this time, Defendants spent millions working to complete and market the series. The relief Pepperdine seeks is designed for "emergency situations" only.  *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 20 n.33 (1980).  Its delay in seeking relief (intentional or not) plainly prejudices defendants. *Fivefold Properties Dunnegan LLC v. Toorak Cap.*

*Partners LLC*, 2024 WL 3009327, at *2 (C.D. Cal. May 7, 2024) ("some courts deny emergency relief based on delays of as little as ten days") (collecting cases).

While Pepperdine makes conclusory arguments about how Defendants would not be harmed by an injunction, that is plainly not true.  As shown by Netflix and Warner executives, both companies would lose millions of dollars, and numerous third parties (actors, directors, writers, and advertisers) would be harmed.  (Paul Decl. ¶¶ 13, 15-17; Pakosta Decl. ¶¶ 5-8.)  If enjoined, Defendants would be forced to halt the February 27 release of *Running Point*, which has been widely-publicized for close to a year, including heavily in recent weeks.  (*Id.*)  It cost millions to make *each episode* of ten, and millions more to market the series.  (*Id.*)  Deleting any reference to the Waves team in *Running Point* would require a re-edit or re-shoot of the entire series, if it is possible to re-shoot, given demanding schedules of talent. *Running Point* involves the work of a cast and crew of over 200 people; an injunction would put future seasons of series and the jobs at serious risk.  (*Id.*)

Weighing the remote and speculative harm to Pepperdine against the concrete and immediate harms to Defendants, the balance of hardships weighs decidedly against an injunction.  Courts hold that enjoining the release of a TV show can cause tremendous hardship and, thus, regularly deny such relief. *E.g.*, *Arenas v. Shed Media U.S. Inc*., 881 F. Supp. 2d 1181, 1195 (C.D. Cal. 2011), *aff'd sub nom.* 462 F. App'x 709 (9th Cir. 2011) (equities weighed against enjoining reality show, which would cause defendant "to lose payments, subject it to liability for lost advertising revenues, and injure its reputation in the industry"); Dkt.-21 at 8, *Llusionist Distrib., LLC v. Sony Pictures Classics, Inc., et al*., No. 10-CV-08062-DMG, (MANx) (C.D. Cal. Nov. 4, 2010) (equities "sharply in favor of Defendants" where enjoining the release of film would put revenues at risk, cause defendants to change title of their film, select a different release date, and jeopardize chances of award nominations); *Chase-Riboud v. Dreamworks, Inc*., 987 F. Supp. 1222, 1233 (C.D. Cal. 1997).

Lastly, the public interest weighs heavily against enjoining *Running Point*.
Free expression, from leading, young voices is at stake here.  The series addresses
issues of important concern, including glass ceilings in corporate America at the
center of public discussion.  Courts "consistently recognize[] the significant public
interest in upholding First Amendment principles" and refuse to enjoin such creative
works.  *Arenas*, 881 F. Supp. 2d at 1195.  "The public has a substantial interest in
preventing artistic expression from becoming stifled by overzealous intellectual
property protection." *Llusionist*, *supra*, at 8.

## IV.    A BOND OF $50,000,000 WOULD BE REQUIRED.

In the unlikely event that the Court enters a TRO or injunction, Defendants
request a bond in the amount of $50,000,000.  Under FRCP 65(c), "[t]he court may
issue a preliminary injunction or [TRO] only if the movant gives security in an
amount that the court considers proper to pay the costs and damages sustained by
any party found to have been wrongfully enjoined or restrained."

Pepperdine asks the Court to dispense with the bond requirement entirely.
TRO Br. at 22.  While the court has discretion to waive bond where "there is no
realistic likelihood of harm to the defendant from enjoining his or her conduct,"
*Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009), that is plainly not the
case here.  While Pepperdine, a school that reports an endowment of $1.2 billion,[6]
says that it should be exempt from a bond because it is a "non-profit," TRO Br. at
22, it provides no legal authority so holding.  In doing so, it omits that courts
regularly require nonprofits to post injunction bonds.  *See Save Our Sonoran, Inc. v.
Flowers*, 408 F.3d 1113, 1125 (9th Cir. 2005) (no abuse of discretion in setting
$50,000 bond in case by environmental organization); *Habitat Educ. Ctr. v. U.S.
Forest Serv.*, 607 F.3d 453, 461 (7th Cir. 2010) (rejecting argument that nonprofits
are exempted from bond requirement).

---

[6] *See* https://www.pepperdine.edu/annualreports/2022.

**MEM. OF P&A IN OPP. TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

1    **V.    CONCLUSION**

2            This misguided lawsuit should never have been filed.  In no event, should

3    Pepperdine's motion seeking the extraordinary remedy of enjoining the launch of a

4    TV series be granted.  That is especially the case when Pepperdine has so misled the

5    Court about the applicable law and ignored such obvious bad facts.

6            No TRO, preliminary injunction, or OSC re injunction should issue.  And this

7    case should be set on a fast track for a motion to dismiss it under the *Rogers* test.

8    Dated: February 24, 2025                    Respectfully submitted,

9

10                                                    By: */s/ Daniel M. Petrocelli*
                                                    _____

11                                                    Daniel M. Petrocelli
12                                                    Matthew T. Kline
                                                    Amy R. Lucas
13                                                    O'MELVENY & MYERS LLP

14                                                                -and-

15                                                    James D. Weinberger
16                                                    Shelby P. Rokito
                                                    FROSS ZELNICK LEHRMAN & ZISSU, P.C.
17                                                    (*pro hac vice applications forthcoming*)

18

19                                                    Attorneys for Defendants NETFLIX, INC and
                                                    WARNER BROS. ENTERTAINMENT INC.
20

21

22

23

24

25

26

27

28

**MEM. OF P&A IN OPP. TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**

## **Certificate of Compliance (Local Rule 11-6.2)**

The undersigned, counsel of record for Defendants Netflix, Inc. and Warner Bros. Entertainment Inc., certifies that this memorandum of points and authorities contains 6,926 words, including headings, footnotes, and quotations but excluding the caption, the table of contents, the table of authorities, the signature block, this certification, and any indices and exhibits.

Accordingly, it complies with the word limit set by Central District of California Local Civil Rule 11-6.1.

Dated: February 24, 2025

By: */s/ Daniel M. Petrocelli*

—————————————————

Daniel M. Petrocelli
Matt Kline
Amy R. Lucas
O'MELVENY & MYERS LLP

-and-

James D. Weinberger
Shelby P. Rokito
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
(*pro hac vice applications forthcoming*)

Attorneys for Defendants NETFLIX, INC and WARNER BROS. ENTERTAINMENT INC.

**MEM. OF P&A IN OPP. TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER**