1  DANIEL M. PETROCELLI (SBN 97802)
   dpetrocelli@omm.com
2  MATT KLINE (SBN 211640)
   mkline@omm.com
3  AMY R. LUCAS (SBN 264034)
   alucas@omm.com
4  O'MELVENY & MYERS LLP
   1999 Avenue of the Stars, 8th Floor
5  Los Angeles, California 90067
   Tel: (310) 553-6700
6  Fax: (310) 246-6779

7  JAMES D. WEINBERGER
   (*admitted pro hac vice*)
8  jweinberger@fzlz.com
   SHELBY P. ROKITO
9  (*admitted pro hac vice*)
   srokito@fzlz.com
10 FROSS ZELNICK LEHRMAN & ZISSU, P.C.
   151 West 42nd Street, 17th Floor
11 New York, New York 10036
   Tel.: (212) 813-5900
12 Fax: (212) 813-5901

13 *Attorneys for Defendants*

14

15                UNITED STATES DISTRICT COURT

16                CENTRAL DISTRICT OF CALIFORNIA

17

| | |
|---|---|
| 18  PEPPERDINE UNIVERSITY, | Case No. 2:25-cv-01429-CV (ADSx) |
| 19                Plaintiff, | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| 20        v. | |
| 21  NETFLIX, INC., WARNER BROS. ENTERTAINMENT INC., and KALING INTERNATIONAL, INC., | |
| 22 | [*Filed concurrently with Declaration of Matt Kline; Notice of Lodging; [Proposed] Order*] |
| 23                Defendants. | |
| 24 | Hearing Date: June 20, 2025 |
| 25 | Time: 1:30 p.m. |
| 26 | Place: Courtroom 5D Judge: Hon. Cynthia Valenzuela |
| 27 | |
| 28 | |

## NOTICE OF MOTION AND MOTION TO DISMISS

**TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on June 20, 2025, at 1:30 p.m. or as soon thereafter as the matter may be heard, in the United States District Court, Central District of California, U.S. Courthouse, 350 West First Street, Los Angeles, California 90012, Courtroom 5D, before the Honorable Judge Cynthia Valenzuela, Defendants Netflix, Inc., Warner Bros. Entertainment Inc., and Kaling International, Inc. will, and hereby do, move the Court for an order dismissing all of the claims in Plaintiff Pepperdine University's First Amended Complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6).

Defendants seek dismissal of Pepperdine's FAC because *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), and Ninth Circuit caselaw applying it bar Pepperdine's claims. Even setting *Rogers* aside, Defendants are not liable for alleged infringement of Pepperdine's trademarks by third parties, and Pepperdine cannot maintain claims for trademark dilution or false advertising. Since Pepperdine has already amended its complaint and any further amendment would be futile, Defendants respectfully request that the Court dismiss Pepperdine's FAC without leave to amend.

This Motion is based on this Notice of Motion; the accompanying memorandum of points and authorities; the flash drive of *Running Point* episodes incorporated by reference in the FAC and lodged with this Motion and the supporting declaration of Matt Kline; the papers and records on file in this action; and such other written and oral argument as may be presented to the Court.

This motion is made following the conferences of counsel pursuant to L.R. 7-3, which took place on March 6 and April 15, 2025.

DEFS.' MOT. TO DISMISS FAC
2:25-CV-01429-CV (ADSx)

1    Dated:  April 18, 2025      By: */s/ Matt Kline*

2

3                               Daniel M. Petrocelli
Matt Kline

4                               Amy R. Lucas
O'MELVENY & MYERS LLP

5                               -and-

6                               James D. Weinberger
Shelby P. Rokito

7                               FROSS ZELNICK LEHRMAN & ZISSU, P.C.

8                               (*admitted pro hac vice*)

9

10                               *Attorneys for Defendants*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................... 1

II.   FACTUAL BACKGROUND............................................................................. 2

III.  LEGAL STANDARD ...................................................................................... 5

IV.   ARGUMENT .................................................................................................... 6

   A.   Pepperdine Has Failed to State Any Claim. .................................................. 6

     1.   *Rogers* applies because *Running Point* is an expressive work, and
Defendants do not use the Waves marks in a source-identifying way............... 8

     2.   *Prong 1 of Rogers*:  Defendants' use of the Waves marks is artistically
relevant. ................................................................................................ 16

     3.   *Prong 2 of Rogers*:  Defendants' use of the Waves marks does not
explicitly mislead consumers............................................................................ 17

     4.   Defendants are not liable for third-party merchandising. ...................... 18

     5.   Pepperdine cannot maintain its claim for trademark dilution. ................. 19

     6.   Pepperdine cannot maintain claims for false advertising.......................... 20

   B.   The Court Should Deny Leave to Amend. .................................................. 21

V.    CONCLUSION................................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allergan USA, Inc. v. Prescribers Choice, Inc,*
    364 F. Supp. 3d 1089 (C.D. Cal. 2019)..................................................................20

*ANT v. McPartlin,*
    2010 WL 11520033 (C.D. Cal. Aug. 5, 2010) ........................................................8

*Apple Inc. v. Amazon.com Inc.,*
    915 F. Supp. 2d 1084 (N.D. Cal. 2013)..................................................................21

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................................................6

*Balistreri v. Pacifica Police Dep't,*
    901 F.2d 696 (9th Cir. 1988)...................................................................................5

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...........................................................................................6, 18

*Betty's Found. for Elimination of Alzheimers Disease v. Trinity Christian Ctr. of Santa Ana, Inc.,*
    2022 WL 807391 (9th Cir. Mar. 16, 2022) ............................................................7

*Brown v. Elec. Arts, Inc.,*
    724 F.3d 1235 (9th Cir. 2013).......................................................................2, 7, 16

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
    539 U.S. 23 (2003) .................................................................................................12

*Davis v. Blue Tongue Films,*
    2024 WL 5182630 (9th Cir. Dec. 20, 2024) .........................................................14

*Down to Earth Organics, LLC v. Efron,*
    2024 WL 1376532 (S.D.N.Y. Mar. 31, 2024).......................................................13

*Dr. Seuss Enters., L.P. v. ComicMix LLC,*
    983 F.3d 443 (9th Cir. 2020)....................................................................7, 17, 18

*E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.,*
    547 F.3d 1095 (9th Cir. 2008)........................................................................passim

*Eastland Music Grp., LLC v. Lionsgate Ent., Inc.,*
    707 F.3d 869 (7th Cir. 2013)..................................................................................12

*Gearsource Holdings, LLC v. Google LLC,*
    2020 WL 3833258 (N.D. Cal. July 8, 2020) .........................................................20

*Haas Automation, Inc. v. Steiner,*
    750 F. Supp. 3d 1107 (C.D. Cal. 2024)...............................................2, 7, 13, 21

*Hara v. Netflix, Inc.,*
    2023 WL 6812769 (C.D. Cal. Aug. 23, 2023)..............................................14, 17

*Jack Daniel's Props., Inc. v. VIP Prods. LLC,*
    599 U.S. 140 (2023) ...........................................................................1, 6, 11, 16

*Jackson v. Netflix, Inc.,*
    506 F. Supp. 3d 1007 (C.D. Cal. 2020)..........................................................9, 16

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.,*
    304 F.3d 829 (9th Cir. 2002) ..............................................................................20

*JTH Tax LLC v. AMC Networks Inc.,*
    694 F. Supp. 3d 315 (S.D.N.Y. 2023)....................................................9, 11, 12

*Knievel v. ESPN,*
    393 F.3d 1068 (9th Cir. 2005) ..............................................................................2

*Kwikset Corp. v. Super. Ct.,*
    51 Cal. 4th 310 (2011) .........................................................................................21

*Lipton v. Pathogenesis Corp.,*
    284 F.3d 1027 (9th Cir. 2002) ............................................................................22

*Lockheed Martin Corp. v. Network Solutions, Inc.,*
    194 F.3d 980 (9th Cir. 1999) ..............................................................................19

*Louis Vuitton Malletier S. A. v. Warner Bros. Entertainment Inc.,*
    868 F. Supp. 2d 172 (S.D.N.Y. 2012) ................................................................10

*Mar Vista Ent., LLC v. THQ Nordic AB,*
    2024 WL 3468933 (C.D. Cal. July 8, 2024) ......................................................14

*Mattel, Inc. v. MCA Records, Inc.,*
    28 F. Supp. 2d 1120 (C.D. Cal. 1998)................................................................19

*Mattel, Inc. v. MCA Records, Inc.,*
    296 F.3d 894 (9th Cir. 2002)..................................................................10, 12, 20

*McGillvary v. Netflix, Inc.,*
    2024 WL 3588043 (C.D. Cal. July 30, 2024) ......................................6, 7, 21, 22

*McGlinchy v. Shell Chem.,*
    845 F.2d 802 (9th Cir. 1988) ..........................................................................5, 18

*Mossack Fonseca & Co., S.A. v. Netflix Inc.,*
    2020 WL 8509658 (C.D. Cal. Dec. 23, 2020) ..............................................20, 21

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,*
    494 F.3d 788 (9th Cir. 2007).................................................................................19

DEFS.' MOT. TO DISMISS FAC
                                                       2:25-CV-01429-CV (ADSx)

*Punchbowl, Inc. v. AJ Press, LLC*,
   90 F.4th 1022 (9th Cir. 2024) ................................................ 6, 7, 14, 17

*Reflex Media, Inc. v. Pilgrim Studios, Inc.*,
   2018 WL 6566561 (C.D. Cal. Aug. 27, 2018) ...................................... 7

*Rogers v. Grimaldi*,
   875 F.2d 994 (2d Cir. 1989) .................................................... 1

*Roxbury Ent. v. Penthouse Media Grp., Inc.*,
   669 F. Supp. 2d 1170 (C.D. Cal. 2009) ........................................ 20

*Stewart Surfboards, Inc v. Disney Book Grp., LLC*,
   2011 WL 12877019 (C.D. Cal. May 11, 2011) ............................... 8, 17

*Sw. MFG. LLC v. Wilmar LLC*,
   2024 WL 3718371 (C.D. Cal. July 16, 2024) ................................... 21

*Tiffany (NJ) Inc. v. eBay Inc.*,
   600 F.3d 93 (2d Cir. 2010) .................................................... 19

*Twentieth Century Fox Television v. Empire Distrib. Inc.*,
   161 F. Supp. 3d 902 (C.D. Cal. 2016) .......................................... 8

*Twentieth Century Fox Television v. Empire Distrib., Inc.*,
   875 F.3d 1192 (9th Cir. 2017) ............................................ 7, 8, 9, 16

*University of Ala. Bd. of Trustees v. New Life Art, Inc.*,
   683 F.3d 1266 (11th Cir. 2012) ............................................... 10

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ................................................ 22

*Y.Y.G.M. SA v. Redbubble, Inc.*,
   75 F.4th 995 (9th Cir. 2023) ............................................... 18, 19

**Statutes**

Cal. Bus. & Prof. Code § 14247 ................................................ 8

Cal. Bus. & Prof. Code § 17200 ................................................ 8

Cal. Bus. & Prof. Code § 17500 ................................................ 8

**Other Authorities**

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
   § 31:144.50 (5th ed. 2025) .................................................... 8

*Rutter Civ. Proc. Before Trial*, Federal Ninth Cir. Edition Ch. 1.B ................. 22

I.    **INTRODUCTION**

In its First Amended Complaint ("FAC"), Pepperdine University adds yet another defendant—Mindy Kaling's company—and employs artful pleading to try and avoid the First Amendment.  But the result remains the same: *Rogers v. Grimaldi,* 875 F.2d 994 (2d Cir. 1989), applies and requires dismissal of all claims.

Trademarks "tell[] the public who is responsible for a product." *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 146 (2023).  The Los Angeles Waves is a fictionalized professional basketball team in the television series *Running Point*—and it is *the series* that is the "product" at issue in this trademark case.  The origin of that series is not the made-up Los Angeles Waves team that appears in the show.  Nor is Pepperdine—a place of learning, which does not produce or distribute films or TV series—held out as the origin or source of *Running Point*.  Rather, the origins of the series are proclaimed front-and-center in the opening and closing credits of each episode: Defendants Kaling International, Inc., which conceived, wrote, and produced *Running Point*; Warner Bros. Entertainment Inc., which produced it; and Netflix, Inc., which distributes it.

*Running Point* is indisputably an expressive work.  And Defendants' use of the Los Angeles Waves fictional team name and fictional logos is not as a source-identifier, but rather as part of the series' creative narrative.  Nothing in the FAC—not premiere tickets or stray social media photos—changes the Court's prior conclusion:  The fictional Los Angeles Waves team is creatively relevant to a series set in Southern California and does not explicitly mislead consumers about the series' source.  *See* Order Denying Mot. for TRO [Dkt. 26] ("Order") at 7-8. *Rogers* plainly applies and disposes of all of Pepperdine's claims.

Pepperdine's attempt to hold Defendants liable for unrelated third-party merchandise sales has no basis in law.  Nowhere does the FAC plead any facts plausibly showing that Defendants intentionally induced third parties to infringe the Waves marks.  Similarly, Pepperdine's state-law dilution claim fails under *Rogers*

DEFS.' MOT. TO DISMISS FAC
2:25-CV-01429-CV (ADSx)

and the "non-commercial use" exception to such liability.  Pepperdine's false

advertising claims are untenable under *Rogers* and fail because the FAC does not

identify any false statements made by Defendants about any party's products.

The Court should dismiss the FAC in its entirety—without leave to amend.

## II.  **FACTUAL BACKGROUND**

Pepperdine is a private university in Malibu, California.  FAC [Dkt. 36] ¶ 17;

Order at 3.  Its athletic teams are called the "Waves," for which the university owns

three registered trademarks (together with alleged common law trademarks, "Waves

marks").  FAC ¶¶ 22-23, 33, 36, 38; Order at 3-4.  Pepperdine's colors are various

shades of blue, white, and orange.  FAC ¶¶ 7, 25.

Pepperdine claims that Defendants are using "Pepperdine's registered

trademarks without permission" for their TV series, *Running Point*.  FAC ¶ 1; *see*

*also* Order at 4.  The fictional comedy series—inspired by the real family owners

and front office that run the Los Angeles Lakers—follows protagonist Isla Gordon,

who unexpectedly becomes president of a famous pro basketball franchise called

the "Los Angeles Waves."  FAC ¶¶ 42-43; Order at 3.[1]

Pepperdine alleges that the fictional Los Angeles Waves team uses "similar

logos, branding, and colors to the Pepperdine Waves."  FAC ¶ 44; *see* Order at 4.

---

[1] All 10 episodes of *Running Point* are available on Netflix.  Defendants lodge
three flash drives with copies of the episodes (and the show's trailer) with the
Declaration of Matt Kline filed in support of this motion.  The drives show the
episodes as they appear to the viewing public, save for a watermark added for anti-
piracy purposes and a file name that flashes briefly at the beginning of each episode.
The Court may consider the series on a motion to dismiss under the incorporation-
by-reference doctrine.  *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005);
*Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1248 n.7 (9th Cir. 2013) (court properly
considered video game incorporated by reference in complaint); *Haas Automation, Inc.
v. Steiner*, 750 F. Supp. 3d 1107, 1114-15 (C.D. Cal. 2024) (on appeal)  (book that
allegedly infringed company's trademark rights was incorporated by reference into
complaint); FAC ¶¶ 42, 54, 56, 98-100 (citing trailer and describing episodes' plots);
*id.* ¶ 47 (alleging that "Defendants' use of Pepperdine's marks in the series and in
promotion of the series, *which are incorporated by reference* ….").

DEFS.' MOT. TO DISMISS FAC
2:25-CV-01429-CV (ADSx)

According to Pepperdine, the series includes "themes that are anathema to the values that Pepperdine stands for and promotes," like "substance use" and "foul language." FAC ¶¶ 42, 95-100; *see* Order at 4.

In denying Pepperdine's application for a TRO, the Court correctly held that "Defendants are not using the Waves Marks as source identifying marks." Order at 7. The Court explained that "Defendants' only product at issue is the *Running Point* series, and there is no showing that Defendants have suggested that Pepperdine is the source of the series. Rather, the series will be broadcast on Netflix and the series' title cards confirm that Netflix, Warner Bros., and Mindy Kaling are responsible for the series." *Id*.

Contrary to these inescapable facts and the Court's conclusion, Pepperdine asserts the legal conclusion that Defendants use the Waves marks "in a manner that is source-identifying for the *Running Point* series," FAC ¶ 4, claiming the Waves marks appear throughout the series itself; on "chairs around the set" and "breakfast foods"; on a shirt worn by show creator Mindy Kaling in an Instagram post; on *Running Point* series premiere tickets; and in actors' social media posts, *id*. ¶¶ 4-5, 47, 67-69, 76, 77-81. Pepperdine also contends that "searching 'Los Angeles Waves Basketball' on popular search engines, like Google, after the show's release yields a mix of results—some showing results related to *Running Point* and some showing results related to Pepperdine." *Id*. ¶ 60.

Although Pepperdine states that it "reasonably anticipates that Defendants may seek to promote" *Running Point* by "selling merchandise," it does not allege— nor could it—that Defendants have done so. FAC ¶¶ 64-66. Although Pepperdine claims that Defendants created Waves shirts "for promotional purposes" (as opposed to costumes), it cites only the picture of show creator Ms. Kaling, the caption of which referred to the *Los Angeles* Waves—with no mention of Pepperdine. *Id*. ¶¶ 4, 67-68. Pepperdine alleges that third parties are "selling several variations of Waves-branded merchandise." *Id*. ¶¶ 87, 89-91.

Pepperdine does not, and cannot, allege that the series *Running Point* refers to Pepperdine University or any of its sports teams.  *Running Point*'s title cards and credits refer accurately to the show's producers, which include Warner, Netflix, and Ms. Kaling—and nowhere mention Pepperdine.  *E.g.*, Kline Decl. Ex. A, Episode No. 101 at 00:00-00:16, 29:23-29:38; FAC ¶ 84 ("[W]hen a viewer accesses an episode of *Running Point*, they are first greeted by the Netflix logo.  The viewer then sees the Warner Bros. logo.  Next, the words 'A Netflix Series' appear on the screen, followed by 'A Warner Bros. Television Production.'  And at the end of each episode, the credits list the various contributors to the show … , followed by images displaying 'Kaling International, Inc.,' 'Warner Bros. Television' and lastly, 'Netflix.'").  Each episode of the series contains a disclaimer:  "The characters and events depicted in this motion picture are fictional.  Any similarity to any actual persons, living or dead, or to any actual events, firms, and institutions or other entities, is coincidental and unintentional."  *E.g.*, Kline Decl. Ex. A, Episode Nos. 101-110 at 29:20.

*Running Point*'s ten episodes include myriad plot lines, not one of which references Pepperdine or its sports teams.  *See infra* Appendix A (summarizing the plot of each episode).  The most Pepperdine can allege is that one episode depicts a Christian sponsor that has qualms about associating with the Los Angeles Waves.  FAC ¶ 56.  Beyond Christianity, that fictional sponsor bears no similarity to Pepperdine.  It is an Indiana-based bed and mattress company called "Snooze-O-Pedic," which makes "cheesy mechanical beds."  *See infra* Appendix A; Kline Decl. Ex. A, Episode No. 102 at 03:47-09:40.

Pepperdine tries to manufacture connections between its college sports teams and the series *Running Point*, but none exist.  Nor would such connections make creative sense.  *Running Point* focuses on the interpersonal dynamics of a blended family of owners (detailing their business and personal lives) and the players and coaches for the Los Angeles Waves, a fictional pro sports team.  The fictional team

is based in offices and an arena in downtown Los Angeles, not a private college campus in Malibu.  The series explores evolving norms in corporate America; the challenging business and politics of pro basketball as well as the media and social media ecosystems in which teams operate; the dynamics of being a female leader in a predominantly male business; and economic, racial, and gender inequalities.  *See infra* Appendix A; Kline Decl. Ex. A, Episode Nos. 101-110.  The Los Angeles Waves team competes with fictional pro teams from other cities (Boston, New York, Chicago, San Francisco) and does not play in a college conference or roster amateur players.  *Id.*  The show highlights various areas of Los Angeles like Downtown, Santa Monica, Echo Park, and Boyle Heights.  *Id.*  Malibu is referenced only in passing in the series—*e.g.*, when Isla Gordon's brother, Cam, crashes his car in the first episode.  *Id.*  That is a fleeting, minor plot point that makes no reference to Pepperdine, and is but a moment in an entire series.  Compare that fleeting mention of one of many featured neighborhoods in greater Los Angeles to the multi-episode explorations of the economics of sports broadcasting; abuse of painkillers in pro sports; intense media scrutiny aimed at storied pro franchises; or the struggles Isla and her siblings face trying to find loving, secure relationships.  *See id.*  There is simply no plausible basis for any confusion about the source of *Running Point* from the series itself or any of the facts Pepperdine points to.

III.   **LEGAL STANDARD**

Dismissal is appropriate under Rule 12(b)(6) where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).[2]  While the Court must accept well-pled facts as true, "conclusory allegations without more are insufficient to defeat a motion to dismiss." *McGlinchy v. Shell Chem.*, 845 F.2d 802, 810 (9th Cir. 1988).  Courts do not assume the truth of legal conclusions pled as facts, *see Ashcroft v. Iqbal*, 556 U.S. 662, 677-79

---

[2] Unless noted, internal cites and quote marks are omitted and emphases added.

DEFS.' MOT. TO DISMISS FAC
2:25-CV-01429-CV (ADSx)

(2009), and "plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels" or a "formulaic recitation of the elements of a cause of action," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## IV.  **ARGUMENT**

The Court should dismiss all of Pepperdine's causes of action.  As this Court has already determined, the *Rogers* test applies to Pepperdine's Lanham Act claims because (1) *Running Point* is an expressive work; and (2) Defendants are not using the Waves marks as source-identifiers.  *See* Order at 7.  Once applied, *Rogers* bars Pepperdine's claims because it cannot show that Defendants' alleged use of Waves marks (1) lacks artistic relevance; or (2) explicitly misleads consumers about the source of *Running Point*.  *See id*. at 7-8.  No factual allegations that Pepperdine added in its FAC affect the Court's previous analysis of these issues.

Pepperdine has already demonstrated that it cannot amend its pleading to avoid *Rogers*, so the Court should deny any further leave to amend.

### A.    **Pepperdine Has Failed to State Any Claim.**

Pepperdine cannot maintain any of its claims under the Lanham Act for the same reasons the Court denied Pepperdine's TRO.  *See* Order at 7-8.  "The Lanham Act, 15 U.S.C. § 1051 *et seq*., creates a comprehensive framework for regulating the use of trademarks and protecting them against infringement, dilution, and unfair competition."  *Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022, 1027 (9th Cir. 2024).  Although courts "apply a likelihood-of-confusion test to claims brought under" the Act, "First Amendment concerns sometimes require a heightened showing for a trademark infringement claim to proceed."  *Id*.  "[W]here the allegedly infringing use of a mark is part of an expressive work protected by the First Amendment and the mark is not used to designate the source of [the alleged infringer's] own [products], then the more use-protective *Rogers* test applies."  *McGillvary v. Netflix, Inc.*, 2024 WL 3588043, at *13 (C.D. Cal. July 30, 2024) (quoting *Punchbowl*, 90 F.4th at 1027, and *Jack Daniel's*, 599 U.S. at 145).

Under *Rogers*, "the Lanham Act does not apply unless the defendant's use of the mark (1) is not artistically relevant to the work or (2) explicitly misleads consumers as to the source or the content of the work." *Punchbowl*, 90 F.4th at 1028; Order at 5. Once defendant shows that *Rogers* applies, plaintiff "has the burden to show that it satisfies at least one prong of the *Rogers* test to have a viable" claim. *Betty's Found. for Elimination of Alzheimers Disease v. Trinity Christian Ctr. of Santa Ana, Inc.*, 2022 WL 807391, at *1 (9th Cir. Mar. 16, 2022).

As to the first prong, "the level of relevance *merely must be above zero*." *E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1100 (9th Cir. 2008); *see Twentieth Century Fox Television v. Empire Distrib., Inc.*, 875 F.3d 1192, 1198 (9th Cir. 2017) (for the first prong, "[t]he bar is set low"). As to the second prong, "there must be an *explicit indication, overt claim, or explicit misstatement* about the source of the work." *Punchbowl*, 90 F.4th at 1028. Implicit references (including allusions to an author's well-known works or phrasing) are not enough. *See Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 462 (9th Cir. 2020). "Neither of these prongs is easy [for Plaintiff] to meet." *Id.*

Courts frequently apply *Rogers* at the motion-to-dismiss stage,[3] and to dismiss the same four federal causes of action that Pepperdine asserts.[4] The First

---

[3] *E.g.*, *Brown*, 724 F.3d at 1247-48 (there was "no problem with the district court deciding" issues under *Rogers* "in response to a motion to dismiss"); *Betty's Found.*, 2022 WL 807391, at *1-2 (affirming dismissal of Lanham Act claims where "the operative complaint contain[ed] no factual allegations" to meet either *Rogers* prong); *Haas Automation*, 750 F. Supp. 3d at 1119 (granting motion to dismiss and denying leave to amend where plaintiff could "make no additional allegations to avoid the *Rogers* test"); *McGillvary*, 2024 WL 3588043, at *13 (dismissing infringement claim under *Rogers* and noting that the test "render[ed] any amendment futile").

[4] *E.g.*, *McGillvary*, 2024 WL 3588043, at *13 (trademark infringement claim under 15 U.S.C. § 1114); *Reflex Media, Inc. v. Pilgrim Studios, Inc.*, 2018 WL 6566561, at *1, *6 (C.D. Cal. Aug. 27, 2018) (contributory trademark infringement claim under 15 U.S.C. § 1114); *Brown*, 724 F.3d at 1247-48 (cause of action under 15 U.S.C. § 1125(a)(1)(A)); *Empire*, 875 F.3d at 1196-98 (false advertising under 15 U.S.C. § 1125(a)(1)(B)).

DEFS.' MOT. TO DISMISS FAC
2:25-CV-01429-CV (ADSx)

Amendment provides the same full defense against Pepperdine's state-law claims.[5]

              1.      *Rogers* applies because *Running Point* is an expressive work, and Defendants do not use the Waves marks in a source-identifying way.

*Running Point* easily clears the threshold requirements for application of the *Rogers* test. As a TV series, FAC ¶¶ 1, 42, *Running Point* is unquestionably an expressive work. *See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31:144.50 (5th ed. 2025); *Empire*, 875 F.3d at 1196 ("The Empire television show itself is clearly an expressive work.").

Pepperdine's new allegations in its FAC do not change the Court's previous analysis that *Rogers* applies. First, Pepperdine's new allegations about the use of the Waves marks in the promotion and marketing of *Running Point*[6] misapprehend the law. The "*Rogers* balancing test applies … to expressive works of a hybrid nature, combining artistic expression *and commercial promotion*"—including where "Defendants have used Plaintiff's marks in *advertisements and promotional*

---

[5] *E.g., E.S.S.*, 547 F.3d at 1098, 1101 ("the First Amendment defense applies equally to ESS's state law claims as to its Lanham Act claim"; state law claims included "unfair competition under California Business and Professions Code §§ 17200 et seq. … and unfair competition under California common law"); *ANT v. McPartlin*, 2010 WL 11520033, at *2, *5 (C.D. Cal. Aug. 5, 2010) (alleged use of mark protected by First Amendment; dismissing all federal and state law claims, including for dilution under Cal. Bus. & Prof. Code § 14247, unfair competition under Cal. Bus. & Prof. Code § 17200, and common law unfair competition); *Stewart Surfboards, Inc v. Disney Book Grp., LLC*, 2011 WL 12877019, at *8 (C.D. Cal. May 11, 2011) ("The Ninth Circuit has made clear that the *Rogers* test applies … to state-law unfair competition claims"); *Twentieth Century Fox Television v. Empire Distrib. Inc.*, 161 F. Supp. 3d 902, 910 (C.D. Cal. 2016), *aff'd sub nom. Empire*, 875 F.3d 1192 (Cal. Bus. & Prof. Code §§ 14247, 17200, 17500).

[6] *See, e.g.*, FAC ¶ 4 (complaining that Ms. Kaling wore a Waves shirt in an Instagram post with a link to the *Running Point* trailer); *id.* ¶ 5 ("Waves" appearing on a "ticket" to the premiere party for the series); *id.* ¶¶ 69, 77-79 (*Running Point* actors' Instagram posts show the series' set, including the fictional basketball team's jerseys and logo); *id.* ¶ 87 (alleging that third parties are selling unauthorized Waves merchandise "under the description '*Running Point*'").

*material.*"  *JTH Tax LLC v. AMC Networks Inc.*, 694 F. Supp. 3d 315, 330 n.2 (S.D.N.Y. 2023) (collecting cases).

If the type of promotion Pepperdine references meant the *Rogers* test did not apply, few expressive works would ever enjoy First Amendment protection—which is plainly not the law.  *E.g.*, *Jackson v. Netflix, Inc.*, 506 F. Supp. 3d 1007, 1014 (C.D. Cal. 2020) ("Plaintiffs contend that *Rogers* does not apply because Netflix used Plaintiffs' marks to promote the Documentary….  This argument is foreclosed by Ninth Circuit precedent."); *Empire*, 875 F.3d at 1196-97 ("Although it is true that these promotional efforts"—including "appearances by cast members in other media, radio play, online advertising, live events, and the sale or licensing of consumer goods"—"technically fall outside the title or body of an expressive work, … works protected under [the *Rogers*] test may be advertised and marketed by name.").  As Pepperdine notes, fictional entities within creative works are often central to the narrative.  FAC ¶ 72.  Promoting this fictional content as a part of promoting the artistic work is common and proper.  *E.g.*, *JTH Tax*, 694 F. Supp. 3d at 324-26, 330-41 (refusing to hold producers liable for promotion for *Better Call Saul* that referred to the fictional "Sweet Liberty Tax Services" featured in the series).  No amount of photos scraped from the internet and added to Pepperdine's complaint can change the legal standard or its proper application here.

Second, Pepperdine's recycled (yet amplified) allegations about Defendants' use of Los Angeles Waves jerseys or logos in the series itself[7] are also unavailing.  These in-series uses are protected expression, not source-identifying grounds for liability.  For instance:

- When Mattel sued a band over its song "Barbie Girl"—with lyrics like "Life in plastic, it's fantastic" and "I'm a blond bimbo girl, in a fantasy

---

[7] *See, e.g.,* FAC ¶ 74 (character wearing costume in the series that says "Property of Los Angeles Waves"); *id*. ¶ 46 (fictional Los Angeles Waves basketball court uses "an almost identical WAVES mark in similar colors").

DEFS.' MOT. TO DISMISS FAC
2:25-CV-01429-CV (ADSx)

world"—the Ninth Circuit applied *Rogers*. *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 901-902 (9th Cir. 2002). "If we see a painting titled 'Campbell's Chicken Noodle Soup,' we're unlikely to believe that Campbell's has branched into the art business. Nor, upon hearing Janis Joplin croon 'Oh Lord, won't you buy me a Mercedes–Benz?,' would we suspect that she and the carmaker had entered into a joint venture." *Id*.

- Likewise, when Louis Vuitton sued because a character in the film *The Hangover: Part II* described his luggage as a "Lewis Vuitton," a district court dismissed under *Rogers*. *Louis Vuitton Malletier S. A. v. Warner Bros. Entertainment Inc.*, 868 F. Supp. 2d 172, 180 (S.D.N.Y. 2012).

- And in *University of Ala. Bd. of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1279 (11th Cir. 2012), the court dismissed under *Rogers* when an artist depicted the Crimson Tide's trademarked football uniforms to recount a notable "event … in football history." While the paintings used "realistic portrayals" of the university's "helmets, jerseys, and crimson and white colors," *id.* at 1269, *Rogers* applied: "Even if some members of the public would draw the incorrect inference that the University had some involvement with [the artist's] paintings, prints, and calendars, … that risk of misunderstanding, not engendered by any overt or in this case even implicit claim … is so outweighed by the interest in artistic expression as to preclude any violation of the Lanham Act." *Id.* at 1278-79 (internal brackets omitted).

The same analysis applies here. Just as no one would think that Mattel produced the song "Barbie Girl," Mercedes cut a deal with Janis Joplin, or Louis Vuitton made *Hangover II*, no reasonable consumer would conclude upon seeing the Los Angeles Waves name or logo in *Running Point* that Pepperdine is now in the TV business and sponsored the series. The Supreme Court in *Jack Daniel's* favorably cited the cases above and explained the analytic distinction between when

1   (a) an alleged mark is used solely to perform an "expressive function"; and (b) "an

2   alleged infringer uses a trademark in the way the Lanham Act most cares about: *as*

3   *a designation of source for the infringer's own goods*."  599 U.S. at 153-55, 163.

4          Here, Defendants use the Los Angeles Waves logos and name in *Running*

5   *Point* as a plot device to tell the story of a fictional professional basketball team—

6   solely an expressive function.  No reasonable consumer would conclude upon

7   seeing the Los Angeles Waves name or logos in *Running Point* that Pepperdine is

8   the source of the series.  *E.g., E.S.S.*, 547 F.3d at 1100-01 (applying *Rogers*; "[a]

9   reasonable consumer would not think a company that owns one strip club in East

10  Los Angeles … also produces a technologically sophisticated video game").

11  Pepperdine's FAC conspicuously deletes the one and only consumer reaction to the

12  series it cited in its original complaint: a social media poster making plain they

13  clearly understood the TV series and college were unrelated.  *Cf*. Dkt. 1 ¶ 51.

14         Pepperdine initially failed to cite *Rogers* in its TRO papers at all, Dkt. 2-1,

15  and then said that *Jack Daniel's* basically eliminated protections for trademark use

16  within works of fiction like *Running Point*, Dkt. 20-2 at 1-3.  As Defendants

17  showed in defeating Pepperdine's TRO, this is not an accurate description of the

18  state of the law.  *See* Dkt. 18 at 8-11; Dkt. 22 at 1-5; Order at 5-7.

19         Several recent decisions post-dating *Jack Daniel's* confirm this.  In *JTH Tax*,

20  a real-world retail tax preparation service, "Liberty Tax Service," alleged that the

21  makers of the series *Better Call Saul* infringed and diluted its trademarks by

22  depicting a shady fictional tax preparation business called "Sweet Liberty Tax

23  Services."  694 F. Supp. 3d at 323.  Just as Pepperdine does here, plaintiff alleged

24  multiple similarities between "the fictional Sweet Liberty Tax Services and the real

25  Liberty Tax Service," including "the use of an inflatable Statue of Liberty, the use

26  of checks bearing a Statue of Liberty logo, a Statue of Liberty wall mural inside the

27  tax preparation office, and the use of a red, white and blue motif on the location's

28  exterior."  *Id*.  Plaintiff complained, like Pepperdine, that defendants used the

DEFS.' MOT. TO DISMISS FAC
2:25-CV-01429-CV (ADSx)

fictional tax service when promoting *Better Call Saul* on social media, in a trailer posted on YouTube, and in images posted by a *Better Call Saul* actor. *Id*. at 324-27. One post even featured a mug stamped with the "Sweet Liberty Tax Services" logo that was supposedly "available for purchase or if your tax refund is valued at more than $638." *Id*. at 326. As here, plaintiffs also complained that Sweet Liberty Tax Services appeared in Google searches for Liberty Tax Service. *Id*. at 326-27.

*Rogers* still applied. In granting defendants' motion to dismiss, *JTH* observed: "When the infringing use is a *fictional product or service* shown or referenced *in a work of fiction*, the relevant product for the purpose of comparison to the senior use is the *work of fiction itself* rather than the fictional product or service depicted within that work. In other words, *courts compare real products rather than fictional ones*." *JTH Tax*, 694 F. Supp. 3d at 336 (citing, *e.g.*, *E.S.S.*, 547 F.3d at 1100 (comparing plaintiff's strip club to defendant's video game rather than to the game's depiction of the strip club)). The types of incidental uses that plaintiff—like Pepperdine—called out are not indicia of a trademark-related use, because none was used "to identify the source of *Better Call Saul* or any of Defendants' products." *JTH Tax*, 694 F. Supp. 3d at 332-33; *see also Mattel*, 296 F.3d at 902 (identifying source of song as "publisher or producer").[8]

---

[8] Supreme Court precedent supports *JTH*'s comparison of real, not fictional, products. In *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), the Court defined "origin of goods" in the Lanham Act as "the producer of the tangible goods that are offered for sale, and *not ... the author of any idea, concept, or communication embodied in those goods*." *Id.* at 37. Citing *Dastar*, the Seventh Circuit has explained: "The title of a work of intellectual property can infringe another author's mark only if the title falsely implies that the latter author is its origin…. The titles of Truman Capote's novella *Breakfast at Tiffany's*, and the movie of the same name, do not infringe the rights of Tiffany & Co. because no reasonable reader or moviegoer thinks that the jeweler is the source of the book or the movie…. Only a confusion about origin supports a trademark claim, and 'origin' for this purpose means the 'producer of the tangible product sold in the marketplace.'" *Eastland Music Grp., LLC v. Lionsgate Ent., Inc.*, 707 F.3d 869, 872 (7th Cir. 2013).

DEFS.' MOT. TO DISMISS FAC
2:25-CV-01429-CV (ADSx)

*Down to Earth Organics, LLC v. Efron*, 2024 WL 1376532 (S.D.N.Y. Mar. 31, 2024), is another post-*Jack Daniel's* case in accord.  There, plaintiff—a producer of health-related podcasts and products (Down to Earth)—sued actor Zac Efron and Netflix for trademark infringement and false designation of origin because they titled a TV series focused on wellness and travel "Down to Earth with Zac Efron." *Id.* at *1-2.  *Rogers* applied because Netflix and Efron were not using "Down to Earth" as a source-identifier but, rather, "to identify the subject matter and tone of the Series." *Id.* at *4-5.  Use of those words in the title of the series was artistically relevant and not misleading, the court held, because "it is *highly unlikely* that the public would interpret the title 'Down to Earth with Zac Efron' as denoting the source, publisher, or producer of the product as Plaintiff…. [W]hen a viewer begins to watch the Series, the first title card indicates the Series as 'A Netflix Original Series' and the credits at the end of each episode clearly identifies the producers of the Series …." *Id.* at *6.  Observing that it could apply the *Rogers* test at the Rule 12(b)(6) stage, particularly where "the products … are so dissimilar," the court granted defendants' motion to dismiss.  *Id.* at *1, *9.

Still other courts in this district have applied *Rogers* after *Jack Daniel's* to bar claims like Pepperdine's.  *See* Order at 6.  In *Haas*, for example, plaintiff Haas Automation claimed that defendants infringed its trademark rights by including Haas marks on the front and back covers and inside the author's book "recounting his experiences as Team Principal of the Haas F1 Team during the 2022 Formula 1 season." 750 F. Supp. 3d at 1113.  Finding that *Rogers* applied, the court held, "the Haas Marks [are] not used to tell the consumer who published the book or the source of the book." *Id.* at 1118.  The Court granted defendants' motion to dismiss, finding the use of the marks artistically relevant and not explicitly misleading: "While there's an argument the photo on the cover implicitly suggests endorsement or sponsorship, *there is no explicitly misleading statement*…." *Id.* at 1118-19.

Likewise, in *Hara v. Netflix, Inc.*, 2023 WL 6812769 at *1-4 (C.D. Cal. Aug. 23, 2023) (on appeal), plaintiff, "a well-known drag queen in Hollywood," sued under the Lanham Act, arguing that Netflix and others had misappropriated her likeness by using it in an animated television series. Dismissing plaintiff's claim, the court held: "Plaintiff's argument that this Court should not apply the *Rogers* test based on … *Jack Daniel's* … is unavailing…. Here, the alleged infringement does not identify Plaintiff as the source of the Series. Therefore, controlling Ninth Circuit law requires the application of the *Rogers* test in this case." *Id.* at *2 n.1.

Cases declining to apply *Rogers* post-*Jack Daniel's* all involved clear source-identifying uses and are easily distinguished. For example, in *Punchbowl*, the Ninth Circuit held that *Rogers* did not apply to a trademark dispute where the defendant used plaintiff's mark "Punchbowl" in the name of defendant's company, website, and masthead, as all uses indicated source. 90 F.4th at 1031-32; *see* Order at 6. *Davis v. Blue Tongue Films*, 2024 WL 5182630 at *1-2 (9th Cir. Dec. 20, 2024) (mem. op.), held that *Rogers* did not apply because plaintiff plausibly alleged that the makers of a movie *Gringo* were trying to "exploit[] the goodwill, public recognition and commercial success enjoyed by [the plaintiff's] book" of the same name, which had achieved recent notoriety. Similarly, *Mar Vista Ent., LLC v. THQ Nordic AB*, 2024 WL 3468933, at *1-2 (C.D. Cal. July 8, 2024), declined to apply *Rogers* where plaintiff—a video game publisher that owned the rights to "the storied video game franchise *Alone in the Dark*"—plausibly alleged that defendant "purposefully chose to title its movie 'Alone in the Dark' so that consumers would be misled into believing that Mar Vista's film … [was] affiliated with [plaintiff's] video games." *See also* Order at 6-7.

Here, Defendants do not use the Los Angeles Waves name and logos in a manner that could plausibly suggest that Pepperdine was the source or a sponsor or affiliate of the show. Defendants did not call their series *Pepperdine* or even *Waves*, and Pepperdine cannot plausibly allege that Defendants are trying to exploit

any (limited) consumer recognition of Pepperdine's marks to draw a worldwide audience to *Running Point*. *Cf., e.g.*, FAC ¶¶ 31, 40 (acknowledging Pepperdine's marks may have only "regional" recognition). Indeed, Pepperdine alleges precisely the opposite—that is, that the narrative depicted in *Running Point* is the antithesis of what the school stands for. *E.g.*, *id*. ¶¶ 95-101.

Under *Jack Daniel's* and its progeny, the key question is whether Defendants used names or logos in a way that identifies the source of their product—the series *Running Point*. This Court already answered that question: "Defendants' only product at issue is the *Running Point* series, and there is no showing that Defendants have suggested that Pepperdine is the source of the series." Order at 7. As Pepperdine concedes, Netflix, Warner, and Ms. Kaling are the sources of *Running Point*. *See* FAC ¶¶ 1 (referring to *Running Point* as "Defendants' new series"), 84 (describing title cards and credits). And every episode communicates to viewers clearly the source of the work, through its title cards and credits. *Supra* at 4. Nowhere in that detailed list of contributors, or anywhere else in the series, is Pepperdine ever mentioned.

Nothing Pepperdine added to its FAC changes the Court's analysis or conclusion. Almost every use of the Waves marks that Pepperdine complains about is from *within* the series, like on actors' costumes or walls of gyms. FAC at 20-23, 33, 35-37, 47. And even on the series premiere tickets that Pepperdine cites multiple times (used at a private party for the show, clearly thrown by Defendants), the Waves mark is not used to identify the source of *Running Point* the series. Rather, it is part of a mock-basketball game ticket (not a good sold), creatively evoking the sports theme of the series and party: "DOORS 6:00PM; GAME TIME 7:00PM." *Id*. at 4, 40. An exclusive *party invite* to a *fictional game* played by a *fictional team* does not inject goods into commerce or tell the world that the Los Angeles Waves, let alone the Pepperdine Waves, are the source of a TV series. It is a joke. One akin to "a filmmaker us[ing] a Louis Vuitton suitcase to convey

something about a character" (his vanity and stupidity)—and not evidence of anyone "us[ing] an ever-so-slightly modified LV logo to make inroads in the suitcase market." *Jack Daniel's*, 599 U.S. at 157. Similarly, nor is the invite-only premiere ticket evidence of Warner, Netflix, or Kaling trying to "make inroads" into the real-life world of college sports.

*Rogers* applies.[9]

> 2. *Prong 1 of Rogers*: Defendants' use of the Waves marks is artistically relevant.

Pepperdine cannot meet either prong of the *Rogers* test. "It is obvious" from the FAC that use of the Waves marks "has at least some artistic relevance" to *Running Point*. *Brown*, 724 F.3d at 1243. "The 'Waves' in Defendants' series are based in Los Angeles," FAC ¶ 52, and the series has "beach imagery," *id*. ¶ 59, and "images of the coast," *id*. ¶ 54. *Running Point* "was based on the Lakers," *id*. ¶ 43, and the Los Angeles Waves—like the Lakers—use water features in their names and basketballs in their logos. *Compare id*. at 23, 35 (Waves), *with id*. at 49 (Lakers). These connections to the geographic features, imagery, and character of Los Angeles all evoke the deep roots and sense of history the fictional team has in Los Angeles. This is an important point in understanding the significance of Isla's character taking the helm of such a storied Los Angeles institution. As the Court will see in watching the series, waves are also a metaphor for the many rise-and-fall challenges the team and characters face, especially Isla.

Courts have found that artistic relevance may arise where a mark "support[s] the themes and geographic setting of the work." *Empire*, 875 F.3d at 1199; *see Jackson*, 506 F. Supp. 3d at 1015 (use of "Tiger King" mark artistically relevant to

---

[9] That other fictitious businesses or entities can at some point in their lifecycle be granted trademarks does not make Defendants' use of "Waves" in *Running Point* "source-identifying." FAC ¶ 72. Pepperdine does not allege (nor could it) that Defendants have trademarked or attempted to trademark "Waves." Any arguments about Defendants hypothetically doing so are neither justified nor ripe.

DEFS.' MOT. TO DISMISS FAC
2:25-CV-01429-CV (ADSx)

documentary about man known as "Tiger King"); *Stewart Surfboards*, 2011 WL
12877019, at *4  (use of "Stewart Surfboards" trademark artistically relevant to
book's surfing theme).  The artistic connections in *Running Point* between the
"Waves" mark and the show's themes and setting are plainly "above zero." *E.S.S.*,
547 F.3d at 1100.  "Defendants' use of the Waves Marks," as the Court has found,
"is artistically relevant to the *Running Point* series."  Order at 7.

### 3.    *Prong 2 of Rogers*:  Defendants' use of the Waves marks does not explicitly mislead consumers.

As this Court held at the TRO stage, "Defendants' use of the Waves Marks
does not explicitly mislead consumers as to the source of the work."  Order at 8.
Viewers stream *Running Point* on Netflix, and title cards announce that Defendants
are responsible for the series.  "Neither Pepperdine nor the Waves Marks appear in
the title cards for the series.  There is therefore no implicit, let alone explicit
statement that misleads the consumer as to the source of the series." *Id.*

*Rogers* requires that there be "an *explicit indication, overt claim, or explicit
misstatement* about the source of the work" for liability to attach.  *Punchbowl*, 90
F.4th at 1028.  An implicit suggestion of endorsement is insufficient. *E.g.*, *Dr.
Seuss*, 983 F.3d at 462 (defendant ComicMix's book was "not explicitly misleading
as to its source, though it uses the Seussian font in the cover, the Seussian style of
illustrations, and even a title that adds just one word—Boldly—to the famous
title—*Oh, the Places You'll Go!*"); *Hara*, 2023 WL 6812769, at *4 (noting that
"allegations regarding the impact of the use"—like leaving viewers with the
mistaken impression that the plaintiff endorsed the series—"are insufficient to show
that a content creator *explicitly* misled consumers").

Pepperdine does not (and could not) allege that *Running Point* explicitly
refers to the university.  Far from citing Pepperdine as a source, the series contains a
disclaimer stating it is a fictional work and that any similarity to actual institutions
is coincidental.  *Supra* at 4.  Pepperdine alleges that Defendants' Waves team

"*appears* designed to invoke an association with Pepperdine"; the Los Angeles and Pepperdine Waves have "*correlations* in branding"; and the show is "explicitly misleading as to source."  FAC ¶¶ 10, 50, 93-94.  But speculation about intent, implied correlations, and "formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555; *see also McGlinchy*, 845 F.2d at 810.

As did the losing party in *Dr. Seuss*, the FAC urges that consumers will "draw an (unwanted) association" between the Los Angeles and Pepperdine Waves.  FAC ¶ 61.  But the FAC never cites any explicitly misleading statement—nor can it—and thus the FAC fails as a matter of law.  *See Dr. Seuss*, 983 F.3d at 462.

\*    \*    \*

"Because Defendants' use of the Waves Marks is artistically relevant, and the use of the Marks does not explicitly mislead consumers as to the source of the series, the Lanham Act does not apply, and Pepperdine cannot succeed on its claims."  Order at 8.  This case should be dismissed in its entirety.

### 4.  Defendants are not liable for third-party merchandising.

There are additional reasons to dismiss Pepperdine's tag-on claims.  Despite its allegations that "third parties are now selling several variations of Waves-branded merchandise under the description 'Running Point,'" and that Defendants are the but-for cause of and thus "responsible for these third-party infringements," this claim fails as a matter of law.  FAC ¶¶ 87-91; *see also id*. ¶ 121.  Contributory liability attaches when a party either "*intentionally* induces another to infringe a trademark or … continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement ….'" *Y.Y.G.M. SA v. Redbubble, Inc.*, 75 F.4th 995, 1000 (9th Cir. 2023).  Pepperdine has not alleged (nor could it) that Defendants intentionally induced third parties to infringe the Waves marks.

Nor has Pepperdine alleged that Defendants knew or had reason to know of (or were otherwise willfully blind to) third-party infringement.  Mere "general knowledge that some percentage of the purchasers of a product or service is using it

to engage in infringing activities is insufficient for contributory trademark infringement." *Y.Y.G.M.*, 75 F.4th at 1001; *see Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 107 (2d Cir. 2010) (provider must have "more than a general knowledge or reason to know that its service is being used to sell counterfeit goods" to be liable).

And even if Pepperdine could show that Defendants had the requisite knowledge, Pepperdine has not pled how secondary liability could attach where Defendants do not have "[d]irect control and monitoring of the instrumentality"—here, websites like TeePublic—"used by a third party to infringe the plaintiff's mark …." *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999); *see also Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 807 (9th Cir. 2007) (no contributory trademark infringement where plaintiff did not allege that defendants "have the power to remove infringing material from the[] websites or directly stop their distribution over the internet").

Pepperdine has alleged no facts—and none exist—supporting a viable claim that Defendants are liable for alleged infringement by unknown third-parties.

### 5.    Pepperdine cannot maintain its claim for trademark dilution.

Even if *Rogers* did not bar it, Pepperdine's fifth claim for trademark dilution under California law would fail under the non-commercial use exception to dilution liability.  For instance, in *Mattel, Inc. v. MCA Records, Inc.*, the district court granted summary judgment on plaintiff's federal and California dilution claims, reasoning that the "Barbie Girl" song fell within the non-commercial use exception for both claims.  28 F. Supp. 2d 1120, 1126 n.1, 1154 n.53 (C.D. Cal. 1998) ("First Amendment considerations…apply to claims for dilution under California law"), *aff'd*, 296 F.3d 894.  That was so, the district court reasoned, even though "Barbie Girl is sold for money" and defendants "attempted to market their song, through ads, videos and promotional stickers." *Id.* at 1154 n.54 ("The fact that defendants' product makes a profit or is successful, however, does not affect the protections afforded to it by the First Amendment.").  The Ninth Circuit affirmed, explaining

that the non-commercial use exception applies "[i]f speech is not purely commercial—that is, if it does more than propose a commercial transaction[.]" *Mattel*, 296 F.3d at 906; *see also, e.g.*, *Roxbury Ent. v. Penthouse Media Grp., Inc.*, 669 F. Supp. 2d 1170, 1173, 1175 n.8 (C.D. Cal. 2009) (dismissing federal and state dilution claims; "[a]lthough the [*Rogers*] analysis detailed here focuses on the First Amendment defense to Plaintiff's *infringement* claims, the result is the same with respect to Plaintiff's dilution claims, because Defendants' use of 'Route 66' in the movie title falls within the noncommercial use exemption").

### 6.    Pepperdine cannot maintain claims for false advertising.

Setting the First Amendment aside, Pepperdine cannot maintain its claims for false advertising. *See* FAC ¶¶ 142-48 (false advertising under Lanham Act); 165-70 (alleging violation of California's False Advertising Law ("FAL")). A false advertising claim "requires a showing," *inter alia*, that "the defendant made a false statement either about the plaintiff's or its own product." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 n.4 (9th Cir. 2002). The false statement must relate to "the nature, characteristics, or qualities of a defendant's or plaintiff's goods or services." *Gearsource Holdings, LLC v. Google LLC*, 2020 WL 3833258, at *12 (N.D. Cal. July 8, 2020). "The mere use of an allegedly infringing trademark cannot be construed as a representation that the nature, characteristics, or quality of [defendant's product] is the same as that of [plaintiff's product]." *Id.*

Because Pepperdine alleges no false statement made about its or Defendants' products—and merely duplicates its trademark-infringement claims to support these causes of action—its false advertising claims under the Lanham Act and FAL fail. *See Allergan USA, Inc. v. Prescribers Choice, Inc*, 364 F. Supp. 3d 1089, 1108 (C.D. Cal. 2019) ("Claims under the FAL are substantially congruent to those under the Lanham Act."). The recent decision in *Mossack Fonseca & Co., S.A. v. Netflix Inc.*, 2020 WL 8509658 (C.D. Cal. Dec. 23, 2020), is instructive. There, plaintiffs contended that, by using their logo in a film and trailer, Netflix portrayed them "as

1  criminals and/or in the false light of criminality." *Id*. at \*1-\*3.  However, the court

2  ruled, "*Plaintiffs fail[ed] to identify any false statement in the trailer for the Film*,"

3  meaning they "fail[ed] to plead an essential element of their false advertisement

4  claim with respect to the trailer." *Id*. at \*3 (noting use of the "logo in the trailer for

5  the Film would be protected under the First Amendment pursuant to the *Rogers*

6  test" as well).  Or as another court aptly put it:  "Contrary to Plaintiff's contention,

7  [a] typical allegation of likelihood of confusion caused by an alleged infringement

8  of a mark *does not* relate to a false representation about the nature, characteristics,

9  or qualities of goods or services." *Sw. MFG. LLC v. Wilmar LLC*, 2024 WL

10 3718371, at \*11-12 (C.D. Cal. July 16, 2024); *accord Apple Inc. v. Amazon.com

11 Inc.*, 915 F. Supp. 2d 1084, 1090 (N.D. Cal. 2013) (granting summary judgment on

12 a false advertising claim because the "mere use" of the underlying trademark

13 "cannot be construed as a representation that the nature, characteristics, or quality

14 of the Amazon Appstore is the same as that of the Apple APP STORE").[10]

15         **B.      The Court Should Deny Leave to Amend.**

16         The Court's Standing Order notes that leave to amend is usually freely given.

17 Dkt. 31 at 10-11.  But here, amendment would be futile, as Pepperdine's FAC

18 shows, and as courts have held in similar *Rogers* cases. *E.g.*, *Haas*, 750 F. Supp. 3d

19 at 1119 ("Because Haas Automation can make no additional allegations to avoid

20 the *Rogers* test, this Court finds that amendment is futile.  An amended complaint

21 could not show that Defendants use the Haas Marks as source identifying

22 trademarks, and it could not overcome *Rogers*.  Accordingly, the Court does not

23 grant leave to amend."); *McGillvary*, 2024 WL 3588043, at \*13 (the "*Rogers* test

24 renders any amendment futile").  Because a second amendment is futile, the Court

---

25

26      [10] Pepperdine's claims under the FAL (and under California's Unfair Competition
   Law ("UCL")) also fails because Pepperdine has not alleged economic injury. *See*

27 *Kwikset Corp. v. Super. Ct.,* 51 Cal. 4th 310, 323-26 (2011) (plaintiffs asserting UCL
   and FAL claims must show "economic injury"—*i.e.*, lost money or property—and that

28 the defendant's actions caused the injury); FAC ¶¶ 163, 169 (failing to allege injury).

DEFS.' MOT. TO DISMISS FAC
2:25-CV-01429-CV (ADSx)

need not "prolong the litigation by permitting [it]." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 (9th Cir. 2002).

V.   **CONCLUSION**

Plaintiff's FAC should be dismissed without leave to amend.[11]

Dated:  April 18, 2025            By: */s/ Matt Kline*

Daniel M. Petrocelli
Matt Kline
Amy R. Lucas
O'MELVENY & MYERS LLP

-and-

James D. Weinberger
Shelby P. Rokito
FROSS ZELNICK LEHRMAN &
ZISSU, P.C.
(*admitted pro hac vice*)

*Attorneys for Defendants*

---

[11] In asserting the focused grounds for dismissal above, Defendants do not waive other merits defenses, including that Pepperdine could never possibly prove likelihood of confusion given, *inter alia*: (a) the scores of other Waves marks used by various parties, including in the field of sports and entertainment, and with blue and orange color patterns that reflect beach imagery; (b) Pepperdine's admitted mismanagement of its marks, causing poor brand recognition including even among its own student body and staff; and (c) the obviously very different channels in which the parties compete. *E.g.* Dkt. 18 at 13-18.

Defendants also reserve the right to file an anti-SLAPP motion to strike Pepperdine's state-law claims. *See Rutter Civ. Proc. Before Trial*, Federal Ninth Cir. Edition Ch. 1.B ("State anti-SLAPP rules may apply … to pendent (supplemental) state law claims … joined in federal question cases.").  The statute's purpose is to "allow early dismissal of *meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation*." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1109 (9th Cir. 2003); *see McGillvary*, 2024 WL 3588043, at *13, *15 n.17 (granting anti-SLAPP motions and striking state law claims that arose "from an act in furtherance of the defendant[s'] rights of petition or free speech" while dismissing related trademark claim under *Rogers*).

That chilling effect is particularly acute here in light of Pepperdine needlessly adding Ms. Kaling—the show's writer—to the case as a defendant.

DEFS.' MOT. TO DISMISS FAC
2:25-CV-01429-CV (ADSx)

1

## Certificate of Compliance (Local Rule 11-6.2)

2      The undersigned, counsel of record for Defendants Netflix, Inc., Warner

3  Bros. Entertainment Inc., and Kaling International, Inc., certifies that this

4  memorandum of points and authorities is 22 pages long, including headings,

5  footnotes, and quotations but excluding the caption, the table of contents, the table

6  of authorities, the signature block, this certification, and any indices and exhibits.

7  Accordingly, it complies with the 25-page limit set by the Court's Standing Order.

8

9      Dated:  April 18, 2025          By: */s/ Matt Kline*

10                                          Daniel M. Petrocelli
                                            Matt Kline
11                                          Amy R. Lucas
                                            O'MELVENY & MYERS LLP
12                                          -and-

13                                          James D. Weinberger
                                            Shelby P. Rokito
14                                          FROSS ZELNICK LEHRMAN &
                                            ZISSU, P.C.
15                                          (*admitted pro hac vice*)

16

17                                          *Attorneys for Defendants*

18

19

20

21

22

23

24

25

26

27

28

DEFS.' MOT. TO DISMISS FAC
2:25-CV-01429-CV (ADSx)

### Appendix A – Summary of *Running Point*

- **Episode 101 (Pilot)**:  Cam Gordon, Isla Gordon's older brother, steps down as President of the Waves when his drug habit catches up with him and he crashes his Porsche on the Pacific Coast Highway.  He goes into rehab, names Isla (who was coordinating the Los Angeles Waves' charitable endeavors) the new team President, and leaves her brothers, the current CFO (Sandy) and General Manager (Ness), in their present roles, to their chagrin.  A young concession worker at the Waves stadium, Jackie, learns from a family lawyer, following his mother's death, that he is a half-sibling of Isla, Sandy, and Ness.  Isla's father— the iconic but troubled, deceased owner of the Waves—fathered Jackie out of wedlock.  The audience is introduced to the Waves pro basketball team and its coach.  The team is struggling, and its star player (Marcus) is disengaged from the team.  The tattoo-covered point guard (Travis) is an offensive jerk.  Isla makes a controversial decision not to trade away Travis, and makes other personnel moves instead, which anger her brothers and incite the media.

- **Episode 102**:  The audience is introduced to Isla's fiancé, a pediatrician.  The Waves lose a key sponsor (a mattress-making company, Snooze-O-Pedic, in Indiana) because Cam's drug use and the family's behavior offends the company's Christian leadership.  While Sandy and Ness work behind her back to take her job, Isla secures a replacement sponsor, the cosmetics company Sephora, making the argument that women and girls are pro basketball fans, but are underrepresented by sponsors.  Isla's deal restores the Board's faith in her, and her brother's coup attempt fails.  Under advice of counsel, the Gordon family plans to pay Jackie off and have him sign an NDA about being their sibling.  Jackie and his lawyer are willing to make this deal, but Isla changes everyone's mind, and Jackie is invited to join the family.

- **Episode 103**:  With star player Marcus's help, Isla convinces the disgruntled Waves point guard, Travis, to apologize for a rude video he posted about the

team's new sponsor, Sephora.  At a dinner discussing the need to apologize, Travis makes an unwanted advance toward Isla, and, as is a common theme among the episodes, the social media and sports media ecospheres run wild with the story that Isla and Travis were spotted kissing at a romantic restaurant. Jackie, now working as Isla's personal assistant, has initial missteps in that role but begins to improve.  This and other episodes explore Sandy's relationship with his boyfriend (whom he keeps hidden from the family), Ness's relationship with his wife (a wealthy woman whom Ness met abroad when playing pro basketball), and Isla's relationship with her best friend, Ali, who also works for the Waves.

- **Episode 104**:  Isla meets with other pro basketball team owners, some of whom have proposed a self-serving "streaming" deal that will benefit only four major markets (Los Angeles, New York, San Francisco, and Chicago).  When guilted by the Boston team owner about the unfairness of the deal, Isla rallies all of the other owners to negotiate a deal that will benefit the entire league, only to have Boston join the three other teams signing the non-competitive deal.  Isla and the team continue to struggle and face criticism in the media.  Isla makes time to attend her godson's (Ali's son's) Korean birthday ceremony, and Ness (thrown out of his house by his wife due to one of their typical spats) meets Sandy's long-hidden boyfriend, a dog groomer.

- **Episode 105**:  Isla forgets she agreed to and then feels anxiety about converting to Judaism for her fiancé, Lev, and about the commitment of marriage generally. Isla discusses these insecurities with the team's coach (Jay), who it is becoming apparent is a romantic interest for Isla.  Jackie becomes more entrepreneurial and books a new halftime show for the Waves, but in doing so angers the team's dancers.  Sandy's boyfriend breaks up with him because Sandy has kept him a secret from his family and lied to him about the engagement party he was attending for his sister.  Sandy and Ness have a big fight at the party, and Ness,

Isla, and Sandy all end up wrestling in a swimming pool at the party venue. Marcus starts showing more engagement in the team. He saves the rookie that Isla signed to the team from having to pay for a massive dinner bill run up by the team's veteran players.

- **Episode 106**: The rookie that Isla recruited to the team, Dyson, is shooting well from the three-point area, but struggling abysmally at the free-throw line. Isla hires a free-throw coach from the Indian women's national team, who teaches the rookie to shoot underhand, a style the other Waves players mock. Isla struggles to quell an ugly rumor (started by her brother in rehab) about her trading star player Marcus. After Marcus's agent rips into Isla, she in turn chews out a sports broadcaster in a video he records in his studio. Marcus is about to quit playing for the team and has feigned COVID, when he sees the video of Isla defending him. He not only rejoins the team on the court, he shoots his free-throw underhanded to encourage Dyson to do the same. Jackie goes through a whirlwind of one-night stands—the fact that he is now a Gordon and associated with a pro basketball team gets him significant attention—and he loses focus of a nice, young woman with whom he went on a first date.

- **Episode 107**: Travis's mother shows up in Los Angeles because her son was not traded to the Florida team. She is controlling, intrusive, and manipulative, and Jay, Sandy, and Ness ask Isla to deal with her. The audience also learns that Travis's mother keeps his addiction to painkillers (to treat a knee injury) in check. Jackie contracts a sexually transmitted disease, and learns he gave it to the daughter of the chairman of the Waves' board, another Latino man whom Jackie had admired. Jackie works to apologize to all involved and make amends. Sandy's ex-boyfriend starts dating someone else as well. The Waves team is improving and winning games, but when Travis agrees his mother should be sent home, the audience sees he agreed in part so he could start taking more painkillers.

- **Episode 108**: Jay and his team go to a nightclub to celebrate the team's winning streak. Jay sees his ex-wife's new husband there and angrily shoves his head into a cake, which others record and post online, catching the attention of the league commissioner. The Commissioner orders Isla to suspend Jay for the rest of the season, but Isla gets him to agree to reduce the punishment to a fine and an apology. Without explaining, Jay refuses to apologize, and then Isla learns Jay is looking to transfer to Boston to be with his family, who plan to move there. While Jay is suspended, an incompetent long-time assistant coach takes his place as head coach, and the Waves lose. Isla discovers that Jay got into the fight at the club because the new husband told him that he and Jay's ex-wife were moving to Boston with Jay's kids. Isla agrees to release Jay from his contract at the end of the year, he returns as coach, and the Waves make the playoffs. Meanwhile, Sandy meets someone on Grindr who locks him in his bathroom and burglarizes his house. Isla encourages him to get back together with his ex-boyfriend. Dyson and Marcus uncover Travis's drug problem.

- **Episode 109**: Travis comes come to Isla about his drug problem, but Isla agrees to let him play in the playoffs and go to rehab once the season is over. After Marcus confronts her, Isla reconsiders her decision to let Travis keep playing. Isla ultimately decides to take Travis to rehab, and the Waves win their game despite his absence. But because she took Travis to rehab, Isla not only misses the playoff game, but also misses an awards ceremony for Lev that she promised to attend. Lev is deeply disappointed, says he needs to rethink their relationship, and leaves the house that they share. Meanwhile, Sandy and his ex-boyfriend get back together after Sandy makes a grand romantic gesture at the Waves game. Jackie had encouraged Sandy to reenact one of the dramatic, embarrassing showcases of love that was so prominent in "Rom Coms" of years past.

1    • **Episode 110**:  The Waves make it to the playoffs game that will determine
2    whether they go on to the semifinals.  After going with Sandy and Ness to help a
3    despondent Jackie celebrate his deceased mother, Isla and her brothers run four
4    miles back to the downtown Waves arena, and she makes a rousing speech,
5    invoking the movie character John Wick.  The Waves lose the game at the last
6    minute and are done for the season.  Isla tries to win back Lev, but he insists on
7    needing time apart.  Their relationship situation becomes more confusing when
8    Jay kisses Isla.  After initially pushing Jackie away, the siblings rally around
9    him, and they have a heart-to-heart talk about the importance of family.  When
10   Isla returns to her office to start preparing for the next basketball season, Cam is
11   there and announces that he will take back the reins as President of the Waves.

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFS.' MOT. TO DISMISS FAC
2:25-CV-01429-CV (ADSx)